NORMAN MASS, EXECUTOR (ESTATE OF SARA LOUISE
MASS), ET AL. *v.* UNITED STATES FIDELITY
AND GUARANTY COMPANY
UNITED STATES FIDELITY AND GUARANTY COMPANY *v.*
NORMAN MASS, EXECUTOR (ESTATE OF SARA
LOUISE MASS), ET AL.
(14414)

SHEA, GLASS, COVELLO, BORDEN and BERDON, Js.

Argued February 20—decision released June 9, 1992

*Vincent M. Musto,* for the appellants (Norman Mass, Executor [Estate of Sara Louise Mass], et al.).

*Thomas C. Thornberry,* for the appellee (United States Fidelity and Guaranty Company).

GLASS, J. This is an appeal from the judgment of the trial court granting, in part, the application of the United States Fidelity and Guaranty Company (USF&G) to vacate an arbitration award, and denying the application of Norman Mass, as executor of the estate of Sara Louise Mass and on behalf of his minor children Daniel and Jessica (Mass), to vacate in part or modify the arbitration award. We affirm the judgment of the trial court.

Most of the facts essential to the disposition of this appeal were stipulated to by the parties. On April 18, 1988, an automobile operated by Sara Louise Mass, in which her two minor children, Daniel Mass and Jessica Mass, were passengers, was struck broadside on a residential street in Fairfield by an automobile driven by Christopher Flynn, who was intoxicated, while traveling at a speed in excess of fifty miles per hour. The accident resulted in the death of Sara Mass and in personal injuries to Daniel and Jessica Mass. On and prior to April 18, 1988, USF&G and Norman Mass, the husband of Sara and father of Daniel and Jessica, were parties to an automobile insurance contract. The contract, which covered the Masses' two automobiles, provided uninsured motorist coverage[1] in the amount of $500,000 for each vehicle. The contract also provided

---

[1] In this opinion, the term uninsured motorist coverage encompasses underinsured motorist coverage as well.

for arbitration in case of a disagreement between the parties concerning uninsured motorist claims. On and prior to April 18, 1988, Norman and Sara Mass were also parties to another insurance contract with USF&G, denominated a "Personal Excess Policy," with a face value of $1,000,000, which listed the automobile insurance contract as underlying coverage. Because Flynn carried inadequate liability insurance, Mass sought uninsured motorist recovery under both USF&G policies.

On November 1, 1989, a panel of three arbitrators rendered a decision regarding the amount of insurance coverage available under the Masses' policies with USF&G and the amount of damages suffered by the estate of Sara Mass and the Masses' two minor children. The arbitrators ruled that $2,000,000 was available to the claimants: $500,000 on each of the Masses' two automobiles under the automobile insurance contract plus $1,000,000 under the personal excess policy. The arbitrators determined that the damages suffered were as follows: $1,700,000 by the estate of Sara Mass; $50,000 by Daniel Mass; and $50,000 by Jessica Mass.

Both USF&G and Mass applied to the trial court to vacate the arbitration award. In its application, USF&G asserted that the personal excess policy issued to the Masses did not, by its terms and conditions, provide uninsured motorist coverage, and, further, that USF&G was not obligated under General Statutes § 38-175c to provide such coverage.[2] USF&G claimed, therefore,

[2] In 1991, General Statutes § 38-175a et seq. was recodified as § 38a-334 et seq. We shall refer herein to the former statutory section numbers, cross-referencing the new section numbers where appropriate. General Statutes § 38-175c (now § 38a-336) provides: "(a) (1) Every such policy shall provide insurance, herein called uninsured motorist coverage, in accordance with such regulations, with limits for bodily injury or death not less than those specified in subsection (a) of section 14-112, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehi-

that the arbitrators' ruling should be vacated to the extent that it concluded otherwise. In his application

cles and insured motor vehicles, the insurer of which becomes insolvent prior to payment of such damages, because of bodily injury, including death resulting therefrom, provided each insurer licensed to write automobile liability insurance in this state shall provide such uninsured motorists coverage with limits requested by the named insured upon payment of the appropriate premium, but such insurer shall not be required to provide such coverage with limits in excess of the limits of the bodily injury coverage of such policy issued to such named insured. No insurer shall be required to provide uninsured motorist coverage to (A) a named insured or relatives residing in his household when occupying, or struck as a pedestrian by, an uninsured or underinsured motor vehicle or a motorcycle that is owned by the named insured, or (B) to any insured occupying an uninsured or underinsured motor vehicle or motorcycle that is owned by such insured. Every such policy issued on or after October 1, 1971, which contains a provision for binding arbitration shall include a provision for final determination of insurance coverage in such arbitration proceeding. With respect to any claim submitted to arbitration on or after October 1, 1983, the arbitration proceeding shall be conducted by a single arbitrator if the amount in demand is forty thousand dollars or less or by a panel of three arbitrators if the amount in demand is more than forty thousand dollars.

"(2) *Notwithstanding any provision of this section to the contrary, every such policy issued or renewed on and after July 1, 1984, shall provide uninsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless the insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112.* Such written request shall apply to all subsequent renewals of coverage and to all policies or endorsements which extend, change, supersede or replace an existing policy issued to the named insured, unless changed in writing by the insured.

"(b) (1) An insurance company shall be obligated to make payment to its insured up to the limits of the policy's uninsured motorist coverage after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements, but in no event shall the total amount of recovery from all policies, including any amount recovered under the insured's uninsured motorist coverage, exceed the limits of the insured's uninsured motorist coverage.

"(2) For the purposes of this section, an 'underinsured motor vehicle' means a motor vehicle with respect to which the sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the accident is less than the applicable limits of liability under the uninsured motorist portion of the policy against which claim is made under subdivision (1) of this subsection." (Emphasis added.)

to the trial court, Mass sought to have the arbitrators' award vacated in part or modified to increase the amount of damages found to have been suffered by Sara, Daniel and Jessica Mass and of uninsured motorist coverage found to exist under the two USF&G policies. Mass claimed that the arbitrators incorrectly computed the amount of uninsured motorist coverage as $2,000,000, rather than $3,000,000, because they did not stack the $1,000,000 of coverage available under the personal excess policy. Mass also sought to have the amount of damages increased to at least $7,000,000.

The trial court, relying on *Cohn* v. *Pacific Employers Ins. Co.*, 213 Conn. 540, 569 A.2d 544 (1990), concluded that the personal excess policy did not extend the Masses' underlying uninsured motorist coverage because it (1) required that the insured be responsible for maintaining uninsured motorist coverage, and (2) lacked any agreement requiring USF&G to provide excess uninsured motorist coverage. The trial court therefore granted USF&G's application to vacate the arbitrators' award to the extent that the award included the personal excess policy. The trial court did not find the miscalculation of damages that Mass had claimed, however, and, therefore, denied Mass' application. This appeal to the Appellate Court followed. We transferred the appeal to ourselves pursuant to Practice Book § 4023.

On appeal, Mass claims that the trial court improperly failed to conclude that: (1) the personal excess policy provided uninsured motorist coverage; (2) $3,000,000 in uninsured motorist coverage was available under the two policies with USF&G; and (3) the estate of Sara Mass was entitled to at least $3,000,000 in damages. USF&G presents only one issue on appeal, which we shall address in conjunction with Mass' first claim: whether General Statutes § 38-175c requires that the personal excess policy that USF&G

issued to the Masses provide uninsured motorist coverage when such coverage had already been provided in a separate policy purchased exclusively for automobile liability protection in accordance with § 38-175c.

Mass first claims that the trial court improperly failed to conclude that the personal excess policy issued by USF&G provided uninsured motorist coverage. Mass argues that the trial court misapplied this court's holding in *Cohn* v. *Pacific Employers Ins. Co.*, supra, because the personal excess policy in this case is a *liability* policy, not an *indemnity* policy, as was the policy at issue in *Cohn*. Mass contends that since the personal excess policy covers liability for damages arising out of the operation of an automobile,[3] it is an "automobile liability policy" within the meaning of § 38-175c and, therefore, must provide uninsured motorist coverage pursuant to § 38-175c (a) (2). USF&G argues that the personal excess policy issued to the Masses was not required to provide uninsured motorist coverage under § 38-175c because such coverage had already been provided in accordance with § 38-175c in a separate automobile insurance contract. We are persuaded that the personal excess policy is not an "automobile liability policy" within the meaning of the statute, and, therefore, that the trial court properly concluded that the policy is not required to provide uninsured motorist coverage.

In support of his argument, Mass places substantial reliance on the distinction between an indemnity policy and a liability policy that this court made in *Cohn*. In that case, we affirmed the conclusion of the trial court

---

[3] Mass points to the following definition of "automobile liability insurance," provided in Webster's Third New International Dictionary, which this court adopted in *Simonette* v. *Great American Ins. Co.*, 165 Conn. 466, 470, 338 A.2d 453 (1973): " '[I]nsurance against loss from or legal liability for damages arising out of ownership, maintenance, or operation of a motor vehicle.' "

that an excess policy issued to the plaintiff was not an automobile liability policy within the meaning of § 38-175c because the terms of the policy unequivocally established that it was an *indemnity* policy.[4] What we did not decide in *Cohn,* however, was whether an excess policy whose language provided for *liability* must comply with the uninsured motorist statute.[5]

Unlike the policy involved in *Cohn,* the personal excess policy issued to the Masses by USF&G did not require that the insured's liability be discharged before a cause of action against the insurer would accrue. Id., 547. The policy provided that USF&G would pay damages on behalf of the insured, subject to certain exclusions. Uninsured motorist coverage was not specified in the list of exclusions.[6] The policy further provided that "[r]egardless of the number of insureds, claims or injured persons, the most [USF&G will] pay as damages resulting from one occurrence shall not exceed [$1,000,000]," but that "[i]f primary insurance and this policy cover an occurrence which results in personal injury or property damage, [USF&G will] pay damages which exceed the total applicable primary insurance

---

[4] The relevant language of the policy, which was denominated an "Excess Blanket Catastrophe Liability Policy," provided that the defendant insurer " 'will indemnify the Insured for ultimate net loss in excess of the retained limit hereinafter stated which the Insured shall become legally obligated to pay as damages because of A. personal injury or B. property damage or C. advertising injury . . . .' " (Emphasis omitted.) *Cohn* v. *Pacific Employers Ins. Co.,* 213 Conn. 540, 542–43, 569 A.2d 544 (1990).

[5] In dicta, however, this court stated: "To the extent that there may be similarities in the environment of underlying automobile policies vis-a-vis excess blanket catastrophe liability policies, we conclude that the term automobile liability policy as referred to in [General Statutes] § 38-175c includes only those policies that extend underlying coverage before the operation of any indemnity policy that might otherwise exist." *Cohn* v. *Pacific Employers Ins. Co.,* 213 Conn. 540, 547–48, 569 A.2d 544 (1990).

[6] The parties also stipulated that the Masses had never requested, in writing or otherwise, a reduction in their uninsured motorist coverage from USF&G.

limits." The declarations to the policy provided, inter alia, that the insured shall have "primary insurance" for "auto liability," with limits of $500,000 per accident or occurrence.[7] According to the evidence presented at the arbitration hearing, the Masses paid a total premium of $173 for the personal excess policy during the relevant policy period. The evidence also established that they paid a separate premium of $1000 for the automobile insurance contract for the six month period during which the accident occurred, of which fifty-four dollars went to uninsured motorist coverage.

Pursuant to § 38-175c (a) (2), an insurer is required to provide an insured with uninsured motorist coverage equal to the amount of automobile liability coverage purchased unless the insured elects a lesser amount in writing, although in no event may he elect less than the statutory minimum specified in General Statutes § 14-112 (a).[8] In *Travelers Indemnity Co.* v. *Malec,* 215

[7] The declarations also provided that the insured shall maintain primary insurance for personal liability with limits of $100,000 per occurrence. "Primary insurance" is defined in the policy as "insurance collectible by the insured which covers liability for personal injury or property damage."

[8] General Statutes § 14-112 (a) provides in pertinent part: "To entitle any person to receive or retain a motor vehicle operator's license or a certificate of registration of any motor vehicle when, in the opinion of the commissioner, such person has violated any of the provisions of section 14-222, section 14-224 or subsection (a) of section 14-227a or any similar provision of the laws of any other state or any territory, or who has been convicted of, or has forfeited any bond taken for appearance for, or has received a suspended judgment or sentence for, a violation of any of said provisions, or who has been held or found criminally responsible in connection with any motor vehicle accident resulting in the death of any person, or who has a record on file with the commissioner which is sufficient, in the opinion of the commissioner, to require evidence of financial responsibility for the reasonable protection of other persons, the commissioner shall require from such person proof of financial responsibility to satisfy any claim for damages by reason of personal injury to, or the death of, any one person, of twenty thousand dollars, or by reason of personal injury to, or the death of, more than one person on account of any accident, of at least forty thousand dollars, and for damage to property of at least ten thousand dollars . . . ."

Conn. 399, 576 A.2d 485 (1990), we examined the legislative history and development of § 38-175c. "Prior to the enactment of § 38-175c; see Public Acts 1967, No. 510; [uninsured motorist] coverage, although available, was not required. Coverage was limited to the amount requested by the insured. In 1969, § 38-175c was amended to require parity of [uninsured motorist] coverage with the minimum limits of liability coverage required by General Statutes § 14-112 (a). See Public Acts 1969, No. 202. In 1983, § 38-175c was again amended now to require parity of [uninsured motorist] coverage with the amount of liability coverage purchased by the insured unless the insured specifically requested a lesser amount. See Public Acts 1983, No. 83-461." (Emphasis omitted.) Id., 402–403. We concluded that the recent history of the statute reveals: "(1) a heightened legislative interest in uninsured motorist protection; (2) a mandate to raise the amount of this protection; and (3) an intention to increase the public's consciousness as to the availability of this kind of insurance by requiring increased coverage unless the insured specifically requested otherwise." Id., 403. "A statute is to be construed by considering its legislative history, language, purpose and the circumstances surrounding its enactment." (Internal quotation marks omitted.) Id. Accordingly, we must determine whether these factors, including the policies enumerated in *Travelers Indemnity Co.* v. *Malec,* supra, compel the conclusion that § 38-175c applies to personal excess policies, such as the policy involved in this case.

In discussing the relationship of uninsured motorist coverage to excess (or umbrella) policies, one leading commentator has stated: "Umbrella policies serve an important function in the industry. In this day of uncommon, but possible, enormous verdicts, they pick up this exceptional hazard at a small premium. Assuming one's automobile and homeowner's policies have

liability limits of $100,000 or even $500,000, the umbrella policy may pick up at that point and cover for an additional million, five million, or ten million. It may assume as a primary carrier certain coverages not included elsewhere . . . but *there is no intention to supplant the basic carriers on the homeowners or automobile coverages. . . . However, because of the misunderstanding of the courts as to the nature of such coverages, they have been held to fall within the definition of automobile liability insurance."* (Emphasis added.) 8C J. & J. Appleman, Insurance Law and Practice (1981) § 5071.65, p. 107.

We are persuaded that excess or umbrella policies, such as the policy issued to the Masses by USF&G, serve a purpose distinct from that served by policies that exclusively cover liability from damages arising out of the ownership, maintenance or operation of an automobile. While the Masses' personal excess policy provides, among other coverages, coverage for automobile liability, this does not convert it into an "automobile liability policy" within the meaning of § 38-175c. Rather, the language of the personal excess policy indicates that it was intended as *"excess* insurance designed solely to protect [the Masses] from the infrequent occurrence of catastrophic judgments against [them]." (Emphasis added.) *Trinity Universal Ins. Co.* v. *Metzger,* 360 So. 2d 960, 962 (Ala. 1978).[9]

The personal excess policy issued to the Masses by USF&G did not expressly refer to uninsured motorist coverage. In addition, the record is devoid of evidence that the parties intended to include uninsured motor-

---

[9] As one commentator has noted, to conclude that excess or umbrella policies are required to provide uninsured motorist coverage pursuant to statute could result in "[s]uch [excess or umbrella] coverage being withdrawn from potential insureds or in premium rates being raised so substantially that they will become priced out of the range of most buyers." 8C J. & J. Appleman, Insurance Law and Practice (1981) § 5071.65, p. 108.

ist coverage at the time they entered into the contract. Although the Masses did not explicitly waive uninsured motorist coverage under the excess policy; see footnote 6, supra; no premium for such coverage was paid to USF&G. In contrast, the Masses' automobile insurance contract with USF&G specifically included a premium for uninsured motorist coverage. Moreover, while it is true that the excess policy did not expressly exclude uninsured motorist coverage, this omission does not create any ambiguity in light of other express terms limiting the policy to *excess* liability coverage. See *Hartbarger* v. *Country Mutual Ins. Co.*, 107 Ill. App. 3d 391, 394, 437 N.E.2d 691 (1982). Because the Masses' personal excess policy did not expressly provide uninsured motorist coverage, USF&G was under no obligation to exclude such coverage expressly.[10] See *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 588–89, 573 A.2d 699 (1990) (before need for exclusion arises, there must be coverage within defined scope of policy).

Mass argues, in essence, that uninsured motorist coverage should be provided under the personal excess policy for the premium the Masses paid for such coverage under the primary automobile insurance contract only. Although § 38-175c does not prohibit such a result, we decline to read it into the policy when the language of the policy does not clearly indicate an intent to pro-

---

[10] An insurance contract whose terms are ambiguous must be construed in favor of the insured. *Griswold* v. *Union Labor Life Ins. Co.*, 186 Conn. 507, 513, 442 A.2d 920 (1982). Although this rule of construction extends to exclusion clauses; id., 514; "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." (Internal quotation marks omitted.) *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 584, 573 A.2d 699 (1990). In the present case, where the personal excess policy did not refer to uninsured motorist coverage, to construe the policy to provide uninsured motorist coverage on the basis that such coverage was not expressly excluded would be to " 'read into the insurance contract that which is not there.' " Id., 591.

vide uninsured motorist coverage. See, e.g., *Griswold v. Union Labor Life Ins. Co.*, 186 Conn. 507, 512, 442 A.2d 920 (1982) (determinative question in construing insurance contract is intent of parties, i.e., what coverage insured expected to receive and what insurer was to provide as disclosed by policy provisions). "It is obvious that the present [excess] policy was intended by both parties to protect the insured against excess judgments, and the risks and premiums were calculated accordingly. To require that policy to furnish uninsured motorist coverage would work a substantial revision of that policy." *Hartbarger v. Country Mutual Ins. Co.*, supra, 396.

Mass refers us to certain decisions in jurisdictions in which the courts have concluded that excess or umbrella policies are automobile liability policies that must provide uninsured motorist coverage. See, e.g., *Aetna Casualty & Surety Co. v. Green*, 327 So. 2d 65 (Fla. App.), cert. denied, 336 So. 2d 1179 (Fla. 1976); *Southern American Ins. Co. v. Dobson*, 441 So. 2d 1185 (La. 1983); *Duriak v. Globe American Casualty Co.*, 28 Ohio St. 3d 70, 502 N.E.2d 620 (1986); *Cincinnati Ins. Co. v. Siemens*, 16 Ohio App. 3d 129, 474 N.E.2d 655 (1984). Mass argues that this court should adopt the reasoning of these cases because the applicable uninsured motorist statutes are similar to § 38-175c in that they require an insurer to provide uninsured motorist coverage in amounts *equal to* liability coverage. In other jurisdictions that have considered whether excess policies must provide uninsured motorist coverage pursuant to statute, however, courts have answered the question in the negative. See *O'Hanlon v. Hartford Accident & Indemnity Co.*, 639 F.2d 1019, 1029 (3d Cir. 1981); *Trinity Universal Ins. Co. v. Metzger*, supra; *Hartbarger v. Country Mutual Ins. Co.*, supra; *United Services Automobile Assn. v. Wilkinson*, 132 N.H. 439, 569 A.2d 749 (1989); *Matarasso v. Continental Casualty Co.*,

82 App. Div. 2d 861, 440 N.Y.S.2d 40 (1981), aff'd, 56 N.Y.2d 264, 436 N.E.2d 1305, 451 N.Y.S.2d 703 (1982); *Moser* v. *Liberty Mutual Ins. Co.*, 731 P.2d 406 (Okla. 1986); *Thompson* v. *Grange Ins. Assn.*, 34 Wash. App. 151, 660 P.2d 307 (1983). Mass contends that these decisions are inapposite because the relevant statutes provide for *minimum* uninsured motorist coverage rather than uninsured motorist limits equal to liability limits, as does § 38-175c. But see *United Services Automobile Assn.* v. *Wilkinson*, supra.[11] We are persuaded, nonetheless, that the reasoning of these latter cases applies to § 38-175c.[12]

In *Matarasso* v. *Continental Casualty Co.*, supra, the insured sought uninsured motorist coverage under a "Commercial Umbrella Liability Policy" issued by the defendant insurance company. The umbrella policy protected the insured against claims by third parties in excess of the total applicable limits of liability of certain underlying liability policies, including an automobile liability policy. The umbrella policy, which incorporated

---

[11] The New Hampshire statute at issue in *United Services Automobile Assn.* v. *Wilkinson*, 132 N.H. 439, 448, 569 A.2d 749 (1989), provides that " '[w]hen an insured elects to purchase liability insurance in an amount greater than the minimum coverage required by [the statute], his uninsured motorist coverage shall automatically be equal to the liability coverage elected.' " Unlike General Statutes § 38-175c, the New Hampshire statute contains no waiver provision under which an insured may elect coverage less than his liability limits. Id.

[12] We note that one of the decisions relied on by Mass, *Aetna Casualty & Surety Co.* v. *Green*, 327 So. 2d 65 (Fla. App.), cert. denied, 336 So. 2d (Fla. 1976), is criticized in 8C J. & J. Appleman, Insurance Law and Practice (1981) § 5071.65. Furthermore, the Louisiana Supreme Court concluded that the state's uninsured motorist statute applied to excess or umbrella policies only after a rehearing, and three justices dissented for the reasons assigned in the majority opinion on the original hearing. *Southern AmeriDobson*, 441 So. 2d 1185 (La. 1983). That court's initial decision followed the reasoning of the cases relied on by USF&G, especially *Trinity Universal Ins. Co.* v. *Metzger*, 360 So. 2d 960 (Ala. 1978), and *Hartbarger* v. *Country Mutual Ins. Co.*, 107 Ill. App. 3d 391, 437 N.E.2d 691 (1982).

by reference provisions of the underlying policies with respect to liability coverage, did not include an uninsured motorist endorsement or supplementary uninsured motorist coverage. In concluding that the uninsured motorist endorsement in the underlying automobile liability policy did not apply to the umbrella policy, the Appellate Division of the Supreme Court of New York stated: "The umbrella policy clearly provides *excess protection* for [the insured] and his business *against liability from third party claims.* It incorporates the underlying policies insofar as they provide for protection against liability for damages to third parties. *The uninsured motorist coverage provided by the underlying automobile liability policy does not involve claims of liability against the insured from third parties and is not incorporated by the umbrella policy. Any other interpretation would distort the actual purpose of the umbrella policy.*" (Emphasis added.) Id., 862. The court held that New York's uninsured motorist statute did not mandate uninsured motorist coverage in the umbrella policy because the umbrella policy was not an automobile liability policy within the meaning of the statute, but rather had been purchased to provide excess liability coverage for a variety of potential claims and had been issued upon underlying liability policies. The court concluded that the insured had received the protection of the uninsured motorist statute through his underlying automobile liability policy and, therefore, had not been left without relief. Id.

*Trinity Universal Ins. Co.* v. *Metzger,* supra, involved facts similar to those presented in *Matarasso.* In *Trinity Universal Ins. Co.,* the insured's executor sought uninsured motorist coverage under a "Personal Excess Umbrella Policy" that covered " 'ultimate net loss in excess of the underlying limit which the insured shall become legally obligated to pay as damages because of personal injury or property damage.' " Id., 961. The

"underlying limit" referred to the limits on two underlying policies, including an automobile liability policy. In concluding that the state's uninsured motorist statute[13] did not require uninsured motorist coverage in the umbrella policy, the Alabama Supreme Court stated: "Automobile liability policies and motor vehicle liability policies insure against the risk of loss through the operation of specific automobiles. *An umbrella policy,* on the other hand, *is fundamentally excess insurance designed to protect against catastrophic loss. Before an umbrella policy is issued, a primary policy (the 'underlying policy') must be in existence and this primary policy must by law provide uninsured motorist coverage.* The umbrella policy assumes a risk of much less frequent occurrence, i.e., the risk of judgments in excess of primary policy limits, and accordingly carries premiums which reflect the lesser magnitude of this risk. *The umbrella policy . . . is an inherently different type of insurance from an automobile or motor vehicle liability policy, and consequently does not come within the scope of the uninsured motorist statute."* (Emphasis added.) Id., 962.

In *O'Hanlon* v. *Hartford Accident & Indemnity Co.,* supra, the plaintiff sought reformation of an umbrella policy, denominated a "Personal Catastrophe Plan," which included automobile liability coverage up to the

---

[13] The relevant Alabama statute provided in pertinent part: " 'No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in this state . . . unless coverage is provided therein or supplemental thereto . . . under provisions approved by the commissioner of insurance, for the protection of persons insured thereunder . . . from owners or operators of uninsured vehicles . . . provided, that the named insured shall have the right to reject such coverage . . . .' Tit. 36, § 74(62a), Code of Ala. 1940, Recompiled 1958." *Trinity Universal Ins. Co.* v. *Metzger,* 360 So. 2d 960, 961 (Ala. 1978).

statutory uninsured motorist limits of $300,000.[14] The policy provided uninsured motorist coverage up to $35,000 after the deduction of a "retained limit." The United States Court of Appeals for the Third Circuit concluded that Delaware's uninsured motorist statute did not require the umbrella policy to provide uninsured motorist coverage equal to the statutory limits. The court stated: "Policies such as the [insurer's] umbrella policy . . . with respect to their automobile coverages, would not exist but for underlying primary auto policies to which they provide excess liability insurance. Primary insurance policies . . . by their very existence, provide insureds with all the benefits accorded under [the uninsured motorist statute]. To place umbrella policies within the ambit of [the uninsured motorist statute] would be to apply that section to

---

[14] The Delaware statute, Del. Code Ann. tit. 18, § 3902, as amended, provided in relevant part: "(a) No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle shall be delivered or issued for delivery in this State with respect to any such vehicle registered or principally garaged in this State unless coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured or hit-and-run motor vehicles for bodily injury, sickness or disease, including death, or personal property damage resulting from the ownership, maintenance or use of such uninsured or hit-and-run motor vehicle. Except, that no such coverage shall be required in or supplemental to a policy where rejected in writing, on a form furnished by the insurer describing the coverage being rejected, by an insured named therein, or upon any renewal of such policy unless the coverage is then requested in writing by the named insured. The coverage herein required may be referred to as 'uninsured vehicle coverage.'

"(b) The amount of coverage to be so provided shall not be less than the minimum limits for bodily injury, death and property damage liability insurance provided for under the motorist financial responsibility laws of this State. The coverage for property damage shall be subject to a $250 deductible for property damage arising out of any 1 accident unless the insurer and the insured agree in writing to a different deductible. Each insured shall be offered the option to purchase additional coverage for personal injury or death up to a limit of $300,000, but not to exceed the limits for personal injury set forth in the basic policy." See *O'Hanlon* v. *Hartford Accident & Indemnity Co.*, 639 F.2d 1019, 1021 n.2 (3d Cir. 1981).

require [uninsured motorist] coverage in addition to that provided by primary policies. We do not believe that [the uninsured motorist statute] can be so read, and hold that it is not applicable to policies that provide excess liability insurance." Id., 1027.

The reasoning of the courts in *Matarasso, Trinity Universal Ins. Co.* and *O'Hanlon* applies with equal force to the present case. The personal excess policy that the Masses purchased from USF&G would not have existed but for the underlying primary insurance policies listed in the declarations, including the automobile insurance contract. The underlying automobile insurance contract, which complied with the provisions of § 38-175c, provided the plaintiffs with all of the benefits accorded them pursuant to the statute.

Mass contends that the policy behind § 38-175c is "to ensure that insureds receive more than the bare minimum of [uninsured motorist] coverage in recognition of the often catastrophic consequences of automobile collisions and the gross inadequacy of statutory minimum coverages." While we do not disagree with this contention, we believe that this policy is adequately served by the conclusion we reach in this case. The purpose of § 38-175c is to compensate an insured to the same extent as he would have been if he had been injured by a motorist carrying liability insurance equal to the coverage carried by the insured, unless the insured has elected in writing uninsured motorist coverage in an amount less than his liability coverage. In the present case, it is undisputed that Daniel and Jessica Mass and the estate of Sara Mass were compensated in an amount equal to the liability limits under the Masses' automobile insurance contract with USF&G.[15]

---

[15] USF&G paid the estate $1,000,000, which represents the stacked total of $500,000 on each of the two automobiles covered under the Masses' primary automobile insurance contract.

Accordingly, we are persuaded that the Masses received the full protection contemplated by the statute when they purchased the underlying automobile liability policy.[16]

USF&G also points us to § 38-175a-4 of the Regulations of Connecticut State Agencies in support of its argument that it was not required to provide uninsured motorist coverage to the Masses under the personal excess policy. Pursuant to General Statutes § 38-175a, the insurance commissioner has the authority to enact regulations governing uninsured motorist coverage. In enacting such regulations, however, the commissioner must effectuate the purpose and intent of the uninsured motorist statute. *American Universal Ins. Co.* v. *DelGreco,* 205 Conn. 178, 196, 530 A.2d 171 (1987). In accordance with his statutory authority, the commissioner has promulgated §§ 38-175a-1 through 38-175a-9 of the Regulations of Connecticut State Agencies, which define minimum provisions to be included in automobile liability insurance policies, including uninsured motorist coverage. Section 38-175a-4, entitled "Exceptions," provides in relevant part: "These regulations do not apply to the insurance afforded under any policy . . . if the policy contains an *underlying insurance requirement* . . . ." (Emphasis added.)

Mass argues that § 38-175a-4 is not valid because it conflicts with the purpose and intent of General Stat-

---

[16] We note that this same reasoning obtains in states whose statutes provide for uninsured motorist coverage equal to the minimum amount required by the state financial responsibility law. See, e.g., *Hartbarger* v. *Country Mutual Ins. Co.,* 107 Ill. App. 3d 391, 437 N.E.2d 691 (1982). We conclude, therefore, that the distinction that Mass attempts to draw between statutes that provide for uninsured motorist coverage equal to liability limits and those that provide for only the minimum amount required by law is not dispositive of the question presented.

utes § 38-175c.[17] We disagree. It is well established that "an administrative agency's regulations are presumed valid and, unless they are shown to be inconsistent with the authorizing statute, they have the force and effect of a statute." *Travelers Ins. Co.* v. *Kulla,* 216 Conn. 390, 399, 579 A.2d 525 (1990). Moreover, "[a] person claiming the invalidity of a regulation has the burden of proving that it is inconsistent with or beyond the legislative grant." Id. Finally, the insurance commissioner has a "very broad grant of regulatory authority in filling in the interstices of the uninsured and underinsured motorist coverage legislation, and in doing so his regulation is entitled to great deference." (Internal quotation marks omitted.) Id.; *Roy* v. *Centennial Ins. Co.,* 171 Conn. 463, 473, 370 A.2d 1011 (1976). We are persuaded that § 38-175a-4 of the regulations is consistent with General Statutes § 38-175c. We therefore accord great deference to the commissioner's interpretation that § 38-175c does not apply to policies, such as the policy involved in the present case, that contain an underlying insurance requirement.

Because the personal excess policy issued by USF&G to Norman and Sara Mass is not an automobile liability policy within the meaning of § 38-175c, the trial court properly concluded that the statute did not require the policy to provide uninsured motorist coverage. Therefore, the trial court properly determined that the total amount of uninsured motorist coverage available to the estate of Sara Mass and to Daniel and Jessica Mass was $1,000,000, pursuant to the automobile insurance contract. Our determination regarding this first claim disposes of Mass' second claim that $3,000,000 in uninsured motorist coverage was available under the personal excess policy. In addition,

---

[17] Mass conceded at oral argument, however, that if this court upheld the validity of the regulation, it would apply to the personal excess policy issued by USF&G.

because § 38-175c (b) (1) limits USF&G's liability to the amount of uninsured motorist coverage available; see footnote 3, supra; it is unnecessary to consider his third claim that the award to the estate of his wife was inadequate.

The judgment is affirmed.

In this opinion SHEA, COVELLO and BORDEN, Js., concurred.

BERDON, J., dissenting. I disagree with the majority's holding that excess policies are not "automobile liability policies" for the purpose of the uninsured and underinsured motorist coverage requirements of General Statutes § 38-175c.[1] The plain language of § 38-175c (now recodified as § 38a-336) requires that the "Personal Excess Policy" (excess policy) issued by United States Fidelity and Guaranty Company (USF&G) provide for uninsured motorist coverage.[2] Section 38-175c (a) (2) states that every automobile liability insurance policy shall provide uninsured motorist coverage "with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless the insured requests in writing a lesser amount . . . ." The excess policy, by its specific terms, provides that USF&G will "pay damages on behalf of the insured" subject to certain exclusions, none of which applied to uninsured motorist coverage.

In this case, the majority concedes, as it must, that the excess policy is a liability policy. To avoid the mandate of § 38-175c, however, the majority claims that the excess policy is not an "*automobile* liability policy,"

[1] See footnote 2 of the majority opinion for the text of General Statutes § 38-175c.

[2] As the majority notes, the parties agree that Mass had not requested a reduction in the uninsured motorist coverage from USF&G.

but merely a liability policy and, therefore, not a policy requiring uninsured motorist coverage. (Emphasis added.) It is clear to me, however, that in reaching its conclusion, the majority disregards the plain language of the statute and finesses established precedent.

First, the majority justifies its decision by construing the statute in light of its legislative history. In doing so, it ignores a fundamental rule that when a statute is clear and the language is unambiguous there is no room for construction. *Stuart* v. *Department of Correction,* 221 Conn. 41, 44, 601 A.2d 539 (1992); *Cilley* v. *Lamphere,* 206 Conn. 6, 9–10, 535 A.2d 1305 (1988). Moreover, we cannot read into the legislation provisions that are not clearly stated. *Local 218 Steamfitters Welfare Fund* v. *Cobra Pipe Supply & Coil Co.,* 207 Conn. 639, 645, 541 A.2d 869 (1988). But even if we should consider this legislative history and the underlying policies of the statute mandating uninsured motorist coverage, we should still be led to the conclusion that coverage is required under the excess policy. In *Travelers Indemnity Co.* v. *Malec,* 215 Conn. 399, 403, 576 A.2d 485 (1990), we made clear that one of the major purposes of the statute requiring uninsured motorist coverage was "to raise the amount of this protection."[3]

---

[3] When General Statutes § 38-175c was amended to require uninsured motorist coverage to equal liability coverage, the intent of the framers was clear. "We have no doubt that the General Assembly contemplated that an insured should make a purposeful and knowing decision to request a lesser amount of [uninsured motorist] coverage. The legislative history of Public Acts 1983, No. 83-461 demonstrates the importance that the legislature attached to specific awareness of the content of the statute: 'Under subsection 2, it would require each insured who purchases more than the legally required amount of liability insurance would [sic] receive the same amount of uninsured motorist coverage. The insured would have an opportunity to waive in writing the additional uninsured motorist coverage. *This change would increase the consumer's awareness* of the value of low-cost uninsured motorist coverage which protects the insured and his family members. Apparently many drivers purchase $100,000.00 or more of liability

Second, the majority seems to be saying that, because the excess policy does not specifically provide for uninsured motorist coverage and does not specify a separate premium for it, there is no coverage. Section 38-175c, however, requires such a provision; and if the policy fails to contain it, then the provision should be included as a matter of law. General Statutes § 38-175c (a) (1).[4] To support its position, the majority relies on *Hammer* v. *Lumberman's Mutual Casualty Co.*, 214 Conn. 573, 590–91, 573 A.2d 699 (1990), wherein this court used a reasonable expectation test to determine whether the contested coverage—that is, complications arising from proper treatment—was included in the policy terms. In *Hammer,* however, the contested coverage was not mandated by the legislature. Unlike *Hammer,* this case concerns uninsured motorist coverage, for which the legislature directed that it be provided to the same extent as the liability limits in the policy.

Finally, the majority points to § 38-175a-4 of the Regulations of Connecticut State Agencies, which provides in relevant part that "[t]hese regulations [providing for uninsured motorist coverage] do not apply to the insurance afforded under any policy . . . if the policy contains an underlying insurance requirement . . . ." First, it must be noted that these regulations were adopted in 1975, eight years before the legislature mandated that insurers provide uninsured motorist coverage in amounts equal to an insured's liability limits. More important, the regulations conflict with

---

coverage but leave their uninsured motorist coverage at the minimum of $20,000.00—$40,000.00. Subsection 2 which *gives such a driver an increased amount of uninsured motorist coverage, unless he makes a conscious decision not to purchase it.'* (Emphasis added.) 26 S. Proc., Pt. 9, 1983 Sess., p. 3055, remarks of Senator Wayne A. Baker." *Travelers Indemnity Co.* v. *Malec,* 215 Conn. 399, 403–404, 576 A.2d 485 (1990).

[4] General Statutes § 38-175c (a) (1) provided in pertinent part: "Every such policy *shall* provide insurance, herein called uninsured motorist coverage, in accordance with such regulations . . . ." (Emphasis added.)

the plain language of § 38-175c. Although we normally place great weight on an administrative agency's interpretation of the statute; *Board of Education* v. *State Board of Labor Relations,* 217 Conn. 110, 119–20, 584 A.2d 1172 (1991); *Lieberman* v. *State Board of Labor Relations,* 216 Conn. 253, 263, 579 A.2d 505 (1990); any regulation that exceeds the authority granted to the administrative agency is void. *Berlinski* v. *Ouellette,* 164 Conn. 482, 492, 325 A.2d 239 (1973); see also *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 597, 590 A.2d 447 (1991).

In *Cohn* v. *Pacific Employers Ins. Co.,* 213 Conn. 540, 569 A.2d 544 (1990), this court went to great lengths to distinguish an indemnity policy from that of a liability policy. This distinction afforded the basis for our decision in *Cohn* that an indemnity policy, as distinguished from a liability policy, did not trigger the mandatory uninsured motorist coverage. In *Cohn* we stated the following: "The entire orientation of this contract, as evidenced by its unequivocal language, is to indemnify the insured rather than to assume direct liability to injured third parties. To the extent that there may be similarities in the environment of underlying automobile policies vis-a-vis excess blanket catastrophe liability policies, we conclude that the term automobile liability policy as referred to in § 38-175c includes only those policies that extend underlying coverage before the operation of any indemnity policy that might otherwise exist." Id., 547–48. Although it was dicta, this preview of our opinion two years ago has additional significance. "[T]he legislature is presumed to be aware of the interpretation of a statute and . . . its subsequent nonaction may be understood as a validation of that interpretation. *Phelps Dodge Copper Products Co.* v. *Groppo,* 204 Conn. 122, 134, 527 A.2d 672 (1987), quoting *Ralston Purina Co.* v. *Board of Tax Review,* 203 Conn. 425, 439, 525 A.2d 91 (1987). This presump-

tion is strengthened when the legislature has affirmatively reenacted the statute after the interpretation in question. *Phelps Dodge Copper Products Co.* v. *Groppo,* supra, 134; see also *Turner* v. *Scanlon,* 146 Conn. 149, 156, 148 A.2d 334 (1959)." (Internal quotation marks omitted.) *Union Trust Co.* v. *Heggelund,* 219 Conn. 620, 627, 594 A.2d 464 (1991). Indeed, since the date of our decision in *Cohn,* the legislature amended the statute; Public Acts 1990, No. 90-243, § 127; and did not alter the wording of the statute in regard to requiring uninsured motorist coverage in the amount of an insured's liability coverage.

To support its position, the majority relies on the following cases from other jurisdictions. See *O'Hanlon* v. *Hartford Accident & Indemnity Co.,* 639 F.2d 1019, 1029 (3d Cir. 1981); *Trinity Universal Ins. Co.* v. *Metzger,* 360 So. 2d 960 (Ala. 1978); *Hartbarger* v. *Country Mutual Ins. Co.,* 107 Ill. App. 3d 391, 437 N.E.2d 691 (1982); *United Services Automobile Assn.* v. *Wilkinson,* 132 N.H. 439, 569 A.2d 749 (1989); *Matarasso* v. *Continental Casualty Co.,* 82 App. Div. 2d 861, 440 N.Y.S.2d 40 (1981), aff'd, 56 N.Y.2d 264, 436 N.E.2d 1305, 451 N.Y.S.2d 703 (1982); *Moser* v. *Liberty Mutual Ins. Co.,* 731 P.2d 406 (Okla. 1986); *Thompson* v. *Grange Ins. Assn.,* 34 Wash. App. 151, 660 P.2d 307 (1983). That reliance, however, is misplaced. The majority concedes that in those jurisdictions, "the relevant statutes provide for minimum uninsured motorist coverage rather than uninsured motorist limits equal to liability limits, as does § 38-175c." (Emphasis in original.) Id. Despite this acknowledgment, the majority applies the reasoning of those cases to the provisions of § 38-175c. All but *United Services Automobile Assn.* v. *Wilkinson,* supra, however, turned on the legislative decision to provide for *minimum* uninsured motorist coverage. The Supreme Court of Oklahoma in *Moser* v. *Liberty Mutual Ins. Co.,* supra, 409, summed up the primary

reason for its holding that the uninsured motorist provision applies only to the underlying automobile liability insurance but not to "umbrella" or excess insurance as follows: "This result, and *the distinction inherent in the legislation's aim of providing minimum coverage* is demonstrated from the results reached in other jurisdictions where the same question has been considered. Courts in Delaware [in *O'Hanlon* v. *Hartford Accident & Indemnity Co.,* supra, construing Del. Code Ann. tit. 18, § 3902,] and Illinois [in *Hartbarger* v. *Country Mutual Ins. Co.,* supra,] considering uninsured motorist statutes containing the same . . . language as contained in Oklahoma's [uninsured motorist] statute, concluded that the legislative intent of providing protection against uninsured motorists was fully met by application to primary liability policies. Application of the provisions to supplemental or excess policies was considered to be beyond the intent of the legislation. *In both cases the statutes under consideration provided that the amount of uninsured motorist coverage be commensurate with the limits of liability required under the state financial responsibility laws.*" (Emphasis added.) The majority, therefore, incorrectly ignores the major distinction between the applicable statutes in those jurisdictions that merely mandate a minimum coverage and § 38-175c, which requires that insurers provide uninsured motorist coverage in amounts equal to an insured's liability coverage.

In holding that excess liability insurance came within the purview of a similar statute, the Ohio Supreme Court held: "Clearly, under the express terms of [Ohio's uninsured motorist statute], no exception is made with respect to excess insurance coverage. If the legislature desires to exempt excess liability carriers, they are free to do so. In the meantime, however, we are compelled to hold that excess liability insurance must comport with [the uninsured motorist statute]. In this holding

we approve of *Cincinnati Ins. Co.* v. *Siemens,* (1984) 16 Ohio App. 3d 129, 474 N.E.2d 655."[5] *Duriak* v. *Globe American Casualty Co.,* 28 Ohio St. 3d 70, 72, 502 N.E.2d 620 (1986). Indeed, the Court of Appeals of Ohio concluded that, in light of its statute requiring the offering of equivalent uninsured motorist coverage upon the issuance of automobile liability insurance, any distinction between automobile liability insurance and excess insurance amounted to "a distinction without a difference." *Cincinnati Ins. Co.* v. *Siemens,* supra, 132; see also *Aetna Casualty & Surety Co.* v. *Green,* 327 So. 2d 65 (Fla App.), cert. denied, 336 So. 2d 1179 (Fla. 1976); *Southern American Ins. Co.* v. *Dobson,* 441 So. 2d 1185 (La. 1984).

Finally, the majority quotes 8C J. & J. Appleman, Insurance Law and Practice (1981) § 5017.65, p. 107, wherein it states that excess policies "pick up this exceptional hazard at a small premium." The amount of the premium should not be a concern of ours in determining the law of this state when specific coverage is mandated by our legislature. If the additional risks to the insurer on the excess policy have not already been accounted for, they can be factored into the premium.

I would find that the excess policy provides for uninsured motorist coverage to the extent of $1,000,000, the amount of liability protection afforded to the insureds.[6] Accordingly, I respectfully dissent.

---

[5] Ohio's uninsured motorist statute; Ohio Rev. Code Ann. § 3937.18 (Baldwin); provided in pertinent part: "(A) No automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in the state unless an equivalent amount of . . . [uninsured motorist] coverage . . . is provided therein . . . ."

[6] In this case, for the same reasons as set forth in my dissent in *Curran* v. *Aetna Casualty & Surety Co.,* 222 Conn. 657, 671, 610 A.2d 1198 (1992) (*Berdon, J.,* dissenting), I would find that "stacking" does not apply and that there is $1,000,000 of coverage under this excess policy.