## Irwin Galkin v. Town of Chester

[716 A.2d 25]

No. 97-026

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed June 12, 1998

*Spencer R. Knapp* and *Molly K. Lebowitz* of *Dinse, Erdmann, Knapp & McAndrew, P.C.*, Burlington, for Plaintiff-Appellant.

*Thomas S. Durkin* of *Kramer & Durkin, P.C.*, Brattleboro, for Defendant-Appellee.

**Johnson, J.** Galkin appeals from an order of the Windsor Superior Court granting summary judgment in favor of the Town of Chester. He argues that the trial court erroneously determined that (1) his interest in glebe lands located in Chester is a leasehold and not a fee, (2) the leasehold does not include the right to mine talc deposits on the subject property, and (3) Chester is entitled to an award of its attorney's fees. We affirm the judgment, except for the award of attorney's fees to Chester, which we reverse.

Until shortly before this lawsuit, the parties believed the subject property was held in fee simple by Chester as public or "glebe" lands, and that Galkin was the lessee. Galkin brought this suit challenging that assumption so that he could sell or lease the mineral rights to the property to a third party.

Galkin's chain of title in the subject property dates back to 1947 when the Town of Chester leased the land to one Edward Holt under a durable lease, which provided that the lessee would pay annual rent in return for a tenancy that was to last "as long as wood grows and water runs." The lease also provided that "Edward E. Holt does further agree to use said property in good and husband-like manner."

Holt quitclaimed his interest in the property to Proctor Reels, Inc., from whom Galkin's business, the 251 Corporation, acquired title at a judicial foreclosure sale in 1960. Galkin then transferred title from the corporation to himself by warranty deed in 1969. He later conveyed the property to the Cypress Mining Corporation in early 1984. Later the same year, Cypress Mining Corporation entered into an option agreement with the Town of Chester. The agreement acknowledged that Chester owned the rights to any mineral deposits, and, in exchange for $25,000, Cypress received the exclusive right to purchase Chester's rights for the sum of $350,000. After Cypress declined to exercise its option, it conveyed the property back to Galkin.

## I.

Galkin first contends that the trial court erroneously determined that Chester, rather than he, holds title to the subject land in fee simple. His claim turns on an analysis of historical events relating to the Chester town charter.

Chester's first charter (Wentworth I) was issued in 1754 by New Hampshire's colonial governor, Benning Wentworth, and it named the town "New Flamstead." New Hampshire's colonial government later rescinded this charter, but Governor Wentworth issued a second, virtually identical charter (Wentworth II) in 1761. Both of the Wentworth charters reserved "glebe and school" lands to be used for educational and religious purposes.

New York's colonial government disputed New Hampshire's claim to the land that now comprises the State of Vermont, and New York issued its own land grants and charters (called "patents") covering these lands. In 1766, New York issued a land grant patent for the lands already controlled by the Wentworth II charter. The New York land grant renamed the area Chester and was issued to individuals who were largely different from those listed under Wentworth II. Unlike both Wentworth charters, the New York patent for Chester did not reserve public lands to be used for educational or religious purposes.

In 1779, Thomas Chandler, a proprietor under both the Wentworth II and the New York patent, filed a petition with the Vermont General Assembly seeking to resolve the apparent conflict between Wentworth II and the New York patent. The petition requested that "the Original Proprietors [of the town] or those that purchased of them ought to hold their Lands by Virtue of the New Hampshire Grants, without any Reguard [sic] to the New York Patent." 1 Journals and Proceedings of the Vermont General Assembly, *reprinted in* 3 *State Papers of Vermont*, at 61-62 (1924). The petition also requested that the town be renamed Chester. In response to the petition, the Vermont General Assembly passed a resolution stating "[o]n Petition of Thomas Chandler . . . *Resolved* that the township formerly granted by the Governor of New Hampshire by the name of New Flamstead as described in said petition be and is hereby established by the name of Chester." Petitions for Grants of Lands, 1778-1911, *reprinted in* 5 *State Papers of Vermont*, at 61 (Mary Greene Nye ed.) (1939).

Galkin claims that Chester is governed by the New York patent rather than Wentworth II and because the New York patent does not preserve lands for public uses, that Chester does not actually own any lease lands. He therefore concludes that Chester does not hold title to either the property or the minerals at issue. Although as a durable lessee of Chester's fee, this conclusion would seem to defeat his interest in the property, Galkin contends that he holds title to the property in fee simple by virtue of the Marketable Record Title Act, 27 V.S.A. §§ 601-610. We disagree with both of these assertions.

In support of his claim, Galkin argues that New York required the surrender of New Hampshire grants prior to issuing New York patents. Thus, after the issuance of the New York patent, Wentworth II was no longer Chester's governing charter because it had been surrendered to New York. Moreover, Galkin disputes the trial court's finding that the General Assembly's resolution responding to the Chandler Petition bypassed the New York patent and ratified Wentworth II. He argues that there is an inherent contradiction in the General Assembly's resolution responding to the petition; the "township formerly granted by the Governor of New Hampshire" is significantly different from the land "as described in said petition." The former consisted of 23,000 acres with reserved public lands, while the latter contained 31,700 acres and did not reserve public lands.

Galkin contends that given the "petitioners' self-serving motivations," the petitioners sought the ratification of the New York patent,

and not Wentworth II, because the New York patent provided for more acreage and did not provide for the reservation of public lands. He further contends that we should assume the General Assembly was responsive to the petitioners' request. Under this reading, Galkin argues, the reference in the resolution to the "township formerly granted by the Governor of New Hampshire by the name of New Flamstead" is simply meant to refer back to the way in which the Chandler Petition erroneously called the lands it described. The resolution, he contends, actually established the Town of Chester by granting the lands "as described in said petition," which are the lands granted under the New York patent. Galkin therefore concludes that the Assembly resolution did not ratify Wentworth II, and the New York patent remains in effect.

■ The trial court concluded that the General Assembly's response to the Petition demonstrates its intent that Wentworth II be Chester's governing charter. We agree. The Chandler Petition asked that their land holdings be ratified "by Virtue of the New Hampshire Grants without any Reguard [sic] to the New York Patent." In response, the General Assembly passed a resolution providing that the "township formerly granted by the Governor of New Hampshire by the name of New Flamstead as described in said petition . . . is hereby established." In light of the fact that the petition expressly requests that the Assembly ratify the New Hampshire Grant, we conclude that had the Assembly intended to ratify the New York patent instead, it would have said so. Yet the Assembly omitted any reference to the New York patent.

Galkin next claims that, in any event, the New York patent was ratified by a 1790 agreement between New York and Vermont. The 1790 agreement provided that in return for Vermont's payment of $30,000 to New York, "all New York grants, other than those confirming Wentworth grants, were extinguished." W.T. Bogart, *The Vermont Lease Lands*, at 45 (1950). Galkin argues that the New York patent for Chester confirmed Wentworth II, and the patent was therefore ratified by the Vermont Legislature as of 1790. We disagree.

Even assuming *arguendo* that the New York patent confirmed Wentworth II for purposes of the 1790 agreement, we conclude the General Assembly's approval of the Chandler Petition in 1779 demonstrated the Assembly's intent that Wentworth II be the operative charter. Absent more compelling evidence to the contrary, we decline to hold that the 1790 agreement was intended by the Legislature, some eleven years later, to essentially reverse the General Assembly

resolution approving the Chandler Petition, and to reinstate the New York patent.

Moreover, from the exhibits introduced at trial we note that the historical records of the Town consistently indicate the existence of glebe and school lands, and that the Town has regularly leased the subject property for more than one hundred and fifty years. In light of this long history and absent other evidence of the Legislature's intent, we hold that whatever legal significance the New York patent might have enjoyed prior to the General Assembly's resolution ended in 1779 with Wentworth II remaining in effect as the governing charter. Cf. *Town of Readsboro v. Town of Woodford*, 76 Vt. 376, 378, 57 A. 962, 963 (1904) ("When a municipal corporation has assumed under color of authority, and exercised for a considerable time with the consent of the state, the powers and privileges of such corporations, a private party in private litigation cannot question the legality of its existence."). The parties concede that all glebe and school lots are held in fee by the townships in which they are located, and that the subject property is located within the glebe and school lots designated in Wentworth II. Consequently, we conclude that Chester owns the subject property in fee and that Galkin's interest is limited to that of a durable leasehold.

Having determined that Chester owns the fee in the subject property, we reject Galkin's claim that he owns it under the Marketable Record Title Act, 27 V.S.A. §§ 601-610. As the trial court concluded, Galkin does not and has never held record title to the fee in the property and, consequently, he does not state a claim under the Marketable Record Title Act. See *id.* § 601 (to assert claim party must hold unbroken chain of title of record to the interest for forty years).

## II.

Galkin next argues that even if Chester owns the fee in the property, the Town is precluded from claiming mineral rights because he owns the rights by virtue of his durable lease. Galkin first asserts that 24 V.S.A. § 2403 precludes town selectmen from reserving royalties for minerals extracted from public lands.

When interpreting a statute, we look first to its plain meaning; "[i]f the meaning is plain, we will enforce it according to its terms." *State v. Ashley*, 161 Vt. 65, 67, 632 A.2d 1368, 1370 (1993). "We will read operative sections of a statutory scheme in context and the entire scheme in pari materia." *Id.*

The current statute authorizing towns to lease public lands provides that "[t]he selectmen may lease such lands . . . reserving *rents* for the same." 24 V.S.A. § 2403 (emphasis added). A predecessor statute granted such lands to the towns for the "sole purpose[] of appropriating the *rents and profits* of such lands" for the support of religious worship. Act of Oct. 30, 1794, *reprinted in Laws of Vermont of a Public and Permanent Nature: Coming Down to, and Including, the Year 1824,* ch. XXV at 194 [hereinafter *1824 Compilation*] (emphasis added). Galkin argues that the omission of the word "profits" indicates a legislative intent to disallow the reservation of profits from public lands and limit towns' income from such lands to annual rent.

■ A review of the statutes from the late eighteenth and early nineteenth century reveals, however, that the Legislature did not use uniform language to describe what type of income the towns were authorized to collect. See, e.g., Act of Nov. 5, 1805, *reprinted in 1824 Compilation, supra,* ch. XXV at 198 (The selectmen may lease such lands "reserving an annual *rent* therefor.") (emphasis added); Act of Nov. 3, 1798, *reprinted in 1824 Compilation, supra,* ch. XXV at 196 ("*avails* of such lands") (emphasis added); Act of Oct. 30, 1794, *reprinted in 1824 Compilation, supra,* ch. XXV at 194 ("rents and *profits*") (emphasis added). One amendment to a statute governing public lands changed the way that "the monies arising from the *rents* of the land described in the [prior] act" were distributed. Act of Nov. 11, 1818, *reprinted in 1824 Compilation, supra,* ch. XXV at 198 (emphasis added). The prior statute provided, however, that it was the selectmen's duty to "collect the *rents and profits* of such lands." Act of Oct. 30, 1794, *reprinted in 1824 Compilation, supra,* ch. XXV at 193 (emphasis added). We, therefore, conclude that the use or omission of the word "profits" lacks legal significance, because 24 V.S.A. § 2403 and its predecessors granting the towns the authority to reserve "rent" were intended by the Legislature to include the authority to reserve profits as well.

We find further support for this conclusion when we consider § 2403 in light of related statutory sections. Section 2402 provides that town selectmen "may commence, prosecute or defend, in the name of the town, any action necessary to recover . . . damages for injuries done to [public] lands." Section 2406 permits towns to convey the fee in public lands provided that certain conditions are fulfilled. Considering that the selectmen are empowered to recover damages for "injuries" to the land, and even to convey the town's interest in the

property, we conclude that § 2403 should not be interpreted as restricting the town's interest in public lands to the mere collection of rent.

Galkin next argues that unless the lessor under a durable lease explicitly reserves mineral rights, the right to extract minerals from the property is included in the scope of the lease and therefore belongs to the lessee. As a corollary, he argues that lessors who have not reserved mineral rights are precluded from recovering damages for their extraction in an action for waste.

Galkin does not dispute that the fee owner of real property also owns the rights to the minerals therein. See, e.g., 2 B. Jones, Tiffany on Real Property § 587, at 507 (3d ed. 1939 & Supp. 1997). Instead, he asserts that a lessor of a durable leasehold conveys its interest in the mineral rights of the durable leasehold property to the lessee for the duration of the leasehold, citing *Spaulding v. H. E. Fletcher Co.*, 124 Vt. 318, 205 A.2d 556 (1964).

*Spaulding* involved a glebe lot leased by the selectmen of Plymouth to a tenant in 1819 under a durable lease which provided for annual rent and included a right of re-entry if the rent was overdue. The primary issue in the case concerned which of two conflicting leases would be given effect. The Court decided that a lease of mineral rights from the town to the plaintiff was ineffective because the town was no longer in possession of the rights. See *id.* at 323-24, 205 A.2d at 559-60. The decision does not, however, address whether the mineral rights were transferred as an implicit term of the durable lease or whether the lease expressly provided for the transfer of mineral rights. Accordingly, we find Galkin's reliance on *Spaulding* misplaced.

Nor are we persuaded by the trial court's reliance on *Jones v. Vermont Asbestos Corp.*, 108 Vt. 79, 182 A. 291 (1936). The trial court cited the *Jones* decision as holding that a "durable lease tenant has only possessory interest in 'surface of the soil' absent grant of ownership by lessor." The *Jones* case, however, concerned a challenge to a statutory amendment that, for the first time, permitted towns to convey their fee simple interest in public lands. The Court was also charged with determining the rights of the parties and the State of Vermont to certain glebe land in the Town of Belvidere. The state had a potential claim to mineral rights in the glebe land through a statute providing that all mines or quarries discovered on public land belonged to the state. See *id.* at 103, 182 A. at 302. The Court concluded, however, that once the town conveyed the glebe land to a private entity in fee simple, the state would no longer have an interest

in the minerals because the land would no longer be public land. See *id.* at 103-04, 182 A. at 303. The Court reasoned that after the conveyance, the private entity "as the possessor of the surface of the soil will be deemed to be in possession of whatever lies underneath the surface." *Id.* at 104, 182 A. at 303. *Jones* does not resolve the question presented by the instant case.

Because our precedents do not adequately address the question, we look to the law of real property and the nature of the leasehold interest. This Court has long held that a durable lease creates a leasehold and not a fee. See *University of Vt. v. Ward*, 104 Vt. 239, 263, 158 A. 773, 783 (1932). The relationship between parties to a durable lease is that of landlord and tenant. See *id.* Unless the governing instrument provides otherwise, it is well-settled law that the landlord retains title to mineral rights in the leasehold property. See 2 Tiffany, *supra*, § 633, at 634-35. A tenant is not entitled to extract minerals from the leasehold property; to do so constitutes voluntary waste for which the tenant is answerable. See *id.*; accord *United States v. Bostwick*, 94 U.S. 53, 68 (1876).

Nevertheless, Galkin argues that we should adopt the opposite view, that a durable lease conveys mineral rights even when it is silent as to such rights. In support of his argument, he contends that the possibility of a durable lessor's reversionary interest vesting in possession is so remote that the law of waste should not afford a remedy to the holder of such a tenuous interest. See 8 R. Powell & J. Rohan, Powell on Real Property ¶ 639, at 56-12 (1995) ("[T]o the extent that the possessory interest lacks the certainty of ending, as in the case of common-law estates in fee tail, or of modern estates in fee simple defeasible, the regulatory force of the law of waste decreases."). What Galkin essentially argues is that a durable leasehold is in fact a fee simple determinable, and not a leasehold at all. We have already rejected that claim. See *Ward*, 104 Vt. at 263, 158 A. at 783.

 We see no reason to treat durable leaseholds differently from the more traditional landlord-tenant relationships, nor has Galkin provided us with one. We note in this respect that if Chester intended to convey a fee interest, it could have done so.* Instead, Chester's

---

*Before 1937, town selectmen were precluded from conveying public lands in fee. See *Trustees of Caledonia County Grammar Sch. v. Kent*, 86 Vt. 151, 156, 84 A. 26, 28 (1912). In 1935 the Legislature enacted a statute permitting the Town of Belvidere to convey certain public lands. See 1935, No. 239, § 1; see also *Jones v. Vermont Asbestos Corp.*, 108 Vt. 79, 102, 182 A. 291, 302 (1936) (upholding statute). In 1937 the statute was

conveyance to Holt, through which Galkin's title is derived, expressly stated that it was a lease. In addition, the instrument expressly provided that the lessee agrees to use the property in "good and husband-like manner." We conclude that such a covenant indicates the parties' intention to establish a traditional landlord-tenant relationship. See *Sheldon Slate Prods. Co. v. Kurjiaka*, 124 Vt. 261, 268, 204 A.2d 99, 104 (1964) (deed should be construed to give effect to the intention of the parties). Accordingly, the trial court properly decided that Galkin is barred from mining or selling the mineral rights in the subject property without authorization from Chester.

### III.

Galkin's final claim is that the lower court erred in awarding attorney's fees to the Town of Chester. Vermont adheres to the American Rule with respect to the award of attorney's fees. *Robes v. Town of Hartford*, 161 Vt. 187, 198, 636 A.2d 342, 349 (1993). The American Rule ordinarily prohibits an award of attorney's fees absent a specific statutory provision or an agreement of the parties. *Converse v. Town of Charleston*, 158 Vt. 166, 169, 605 A.2d 535, 537 (1992). There is no statutory provision or agreement of the parties authorizing the trial court to award attorney's fees. We therefore reverse the trial court's award to Chester of its "legal costs and expenses" to the extent that it includes an award of attorney's fees.

*Affirmed, except the award of attorney's fees to Chester is reversed.*

---

amended to remove the prohibition altogether. See 1937, No. 56, § 1. The lease from Chester to Holt was executed in 1947.