2009 VT 92

**Insurance Company of the State of Pennsylvania v. Kerrie A. Johnson, Administrator for the Estate of Michael W. Johnson**

[987 A.2d 276]

No. 08-053

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed August 21, 2009

Motion for Reargument Denied October 15, 2009

*F. Brian Joslin* and *Richard Hennessey* of *Theriault & Joslin, P.C.*, Montpelier, and *Patrick Fredette* and *Timothy Puin* of *McCormick Barstow LLP*, Cincinnati, Ohio, for Plaintiff-Appellant.

*John F. Campbell* of *Cambpell & Saunders*, Quechee, and *Walter G. Campbell* and *Kelley B. Stewart* of *Krupnick, Campbell, Malone, Buser, Slama, Hancock, Liberman & McKee P.A.*, Fort Lauderdale, Florida, for Defendant-Appellee.

¶ 1. **Johnson, J.** We agreed to review the following question certified from the United States District Court for the District of Vermont: "Whether Vermont's uninsured/underinsured motorist statute, 23 V.S.A. § 941, requires excess liability (or umbrella) policies to provide uninsured/underinsured motorist coverage?" For the reasons set forth below, we conclude that the statute does apply to such policies.

¶ 2. This case arises from the tragic death of Vermont State Police Sergeant Michael Johnson while in the course of duty. The facts underlying the incident are set forth in full in *State v. Daley*, 2006 VT 5, 179 Vt. 589, 892 A.2d 244 (mem.). In brief, Sergeant Johnson was struck and killed by a motorist, Eric P. Daley, while laying spikes across a highway in an effort to stop Daley's vehicle, which was then engaged in a high-speed police chase. *Id.* ¶ 4. Daley later pled guilty to seven criminal charges and was sentenced to an aggregate term of imprisonment of twenty-six to thirty-three years. We affirmed on appeal. *Id.* ¶ 13.

¶ 3. Daley's automobile liability insurer subsequently paid the third-party liability policy limit of $25,000 to Johnson's estate. Thereafter, Johnson's employer, the State of Vermont, tendered to the estate its self-insured underinsured-motorist policy limit of $250,000. The estate then filed a complaint in Washington Superior Court against the State, seeking to recover damages in excess of the $250,000 underinsured-motorist limit under the State's two umbrella or excess liability policies in effect at the time of the incident, both of which had been issued by the Insurance Company of the State of Pennsylvania (ICSOP). One policy broadly insured against "liability imposed by law or assumed under an insured contract because of bodily injury or property damage arising out of an occurrence during the Policy Period," and contained a limit of $10 million in excess of the State's $250,000 self-insured retained limit. The other policy was largely identical but contained a proviso limiting coverage to liability arising under the Vermont Tort Claims Act and had a policy limit of $1 million in excess of the $250,000 retained limit. Neither policy expressly provided for uninsured or underinsured (UM/UIM) motorist coverage.

¶ 4. The estate claimed, nevertheless, that because the ICSOP policies provided coverage for "liability arising out of the ownership, maintenance or use" of a motor vehicle, they were required to provide UM/UIM coverage under 23 V.S.A. § 941(a).[1] In response to the superior court claim, ICSOP filed an action in federal district court, seeking a declaration that § 941 does not apply to umbrella or excess liability policies.[2] Following a hearing on the parties' cross-motions for summary judgment, the federal magistrate judge issued a report observing that, while many states with similar UM/UIM statutes had resolved the issue, Vermont had thus far "not addressed the applicability of § 941 to umbrella policies." Because it presented a "purely state law question" and was "outcome determinative," the magistrate judge recommended that the question be certified to this Court. See V.R.A.P. 14. The district court adopted the magistrate judge's recommendation and, as noted, certified the following question: "Whether Vermont's uninsured/underinsured motorist statute, 23 V.S.A. § 941, requires excess liability (or umbrella) policies to provide uninsured/underinsured motorist coverage?" We accepted review.[3]

---

[1] This section provides, in pertinent part, as follows:

No policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle may be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein, or supplemental thereto, for the protection of persons insured thereunder who are legally entitled to recover damages, from owners or operators of uninsured, underinsured or hit-and-run motor vehicles, for bodily injury, sickness or disease, including death, and for property damages resulting from the ownership, maintenance or use of such uninsured, underinsured or hit-and-run motor vehicle.

23 V.S.A. § 941(a).

[2] In response to the filing of the federal suit, the parties voluntarily stayed the superior court proceeding pending completion of the federal declaratory relief action.

[3] This was the sole question certified by the federal court and accepted for review by this Court. ICSOP did not raise, brief, or argue in either the federal district court or this Court any issue relating to the fact that the insured in this case is the State of Vermont, which enjoys sovereign immunity from civil suit subject to certain limited exceptions, including claims within the scope of the Vermont Tort Claims Act, 12 V.S.A. §§ 5601-5606. Indeed, in response to questions at oral argument, ICSOP expressly disclaimed any reliance on the Tort Claims Act or

¶ 5. The principles governing our interpretation of legislation are settled. "Our goal is to implement the Legislature's intent and '[t]he definitive source of legislative intent is the statutory language, by which we are bound unless it is uncertain or unclear.' " *State v. Stell*, 2007 VT 106, ¶ 12, 182 Vt. 368, 937 A.2d 649 (quoting *In re Bennington Sch., Inc.*, 2004 VT 6, ¶ 12, 176 Vt. 584, 845 A.2d 332 (mem.)). "We assume the Legislature intended the plain and ordinary meaning of the language it used, and thus, only when the objective of the legislation would be defeated by literal enforcement of statutory provisions can the Court, in construing a particular law, depart from the ordinary and usual meaning of the language used therein." *Id.* (citation omitted). In the absence of such a showing, "enforcement must be according to the statute's obvious terms." *Id.* (quotation omitted).

¶ 6. As noted, our UM/UIM statute provides, in pertinent part, that "[n]o policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle may be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein" for the protection of an insured "from owners or operators of uninsured, underinsured or hit-and-run motor vehicles." 23 V.S.A. § 941(a). The statute mandates minimal coverage of $50,000 for one person and $100,000 for two or more persons killed or injured, but further provides that if the policy's liability limits are higher, the limits of UM coverage "shall be the same, unless the policyholder otherwise directs." *Id.* § 941(c).

---

sovereign immunity, and acknowledged that no issue in this regard was before the Court. Hence, we need not — and do not — address the effect, if any, of the liability limits of the Tort Claims Act on the availability of UM/UIM coverage under either of the excess/umbrella policies at issue here. Nor do we address the question of which, if any, of the policies might apply in these circumstances, or whether the State voluntarily limited its UM/UIM coverage, as permitted by 23 V.S.A. § 941(c), which states that if the limits of the insured's motor vehicle liability coverage are greater than the minimum coverage amount, the limits of UM/UIM must be the same "unless the policyholder otherwise directs."

We note as well that, although the parties vigorously disputed whether the policies expressly provided for UM/UIM benefits, the federal magistrate judge concluded that they "did not expressly provide underinsured motorist coverage." The estate objected to this portion of the magistrate judge's report and recommendation, but the district court's certification order also concluded that "[t]he policies as worded would not provide coverage in this case." The question of policy coverage was not certified to this Court, and we express no view on the issue.

■ ■ ¶ 7. In providing clearly and unambiguously that "[n]o policy" insuring "against liability arising out of the ownership, maintenance or use of any motor vehicle" may issue without UM/UIM coverage, the statute plainly encompasses the excess policies here at issue. Both ICSOP policies provide coverage for amounts in excess of the limit provided by the State's retained or primary policy (in this case the State's self-insured limit of $250,000) which the State becomes "legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury or property damage arising out of an occurrence during the Policy Period." Both policies expressly refer to the use of "owned" or "hired" motor vehicles by State officials and employees in the course and scope of employment. ICSOP has thus virtually conceded that its policies provide coverage for liability arising out of the ownership, maintenance, or use of a motor vehicle. There is no question, therefore, that the policies fall within the plain and unqualified language of the UM/UIM statute. See *Colwell v. Allstate Ins. Co.*, 2003 VT 5, ¶ 23, 175 Vt. 61, 819 A.2d 727 (construing § 941 to require UM/UIM coverage for all forms of insurance covering motor vehicle liability, including self insurance).

¶ 8. ICSOP asserts, nevertheless, that despite its broad language, § 941 is intended to apply narrowly — and exclusively — to primary automobile liability policies. ICSOP claims that this intention may be inferred from several sources. First, it cites the statute's placement in chapter 11 of Title 23, which sets forth the requirements for drivers to maintain automobile insurance and financial responsibility. Several provisions within the chapter refer, to be sure, to automobile liability insurance. See 23 V.S.A. § 800(a) (setting forth the requirement that drivers maintain "an automobile liability policy" with minimum liability coverage); *id.* § 942 (providing that insurers who are "authorized to issue automobile liability insurance" may issue renewal endorsements and binders); *id.* § 943 (providing broadly that "[a]ll policies of motor vehicle liability insurance delivered or issued . . . in this state shall be deemed to include provisions in accordance" with the subchapter).

■ ■ ¶ 9. It is a substantial stretch, however, to conclude that § 941's reference to policies "insuring against liability arising out of the ownership, maintenance or use of any motor vehicle" must, therefore, have also been intended to refer solely to primary automobile policies. On the contrary, the rules of statutory con-

struction normally demand that we accord significance to variations in legislative language. See *Russello v. United States*, 464 U.S. 16, 23 (1983) (differing language used in different statutory subsections held to have different meaning based on Court's presumption that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely") (quotations omitted); *State v. DeRosa*, 161 Vt. 78, 80, 633 A.2d 277, 279 (1993) ("[W]e presume the Legislature used the language [in the statute] advisedly."). If anything, therefore, the Legislature's decision to predicate the application of § 941 on the nature of the *coverage* rather than — as elsewhere in the chapter — the type of *policy* supports a conclusion that the Legislature fully intended the broad scope that the specific language commands. Absent any evidence of an intent to the contrary, therefore, we discern no grounds to depart from the plain meaning of § 941, which applies by its terms to the excess policies here at issue.

■ ■ ¶ 10. Similarly unpersuasive is ICSOP's claim that § 941's reference to "any motor vehicle registered or principally garaged in this state" evinces a legislative intent to include only primary automobile policies that cover particular vehicles, to the exclusion of excess policies that cover individuals and entities who qualify as insureds. See *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 39, 177 Vt. 215, 862 A.2d 251 (noting that excess policies "provide the insured protection in the event of a catastrophic loss that exceeds the limits of the insured's primary policy"). Of course, uninsured motorist coverage, much like the excess or umbrella policies here at issue, is designed "for the protection of *persons*, not vehicles." *Monteith v. Jefferson Ins. Co. of N.Y.*, 159 Vt. 378, 381, 618 A.2d 488, 490 (1992) (quotation omitted). Even assuming, however, that the phrase "registered or principally garaged in this state" restricted the statute to policies that insure particular motor vehicles, as ICSOP claims, the argument would not carry the day for the insurer. Like all excess policies, the ICSOP policies here require and incorporate by reference the insured's primary underlying policy, which necessarily covers only specified motor vehicles owned, leased, or operated by the State. Thus, as one court — rejecting a claim nearly identical to ICSOP's — has held, an excess policy necessarily "insures 'with respect' to a particular motor vehicle that is named or described

in the policy by incorporation of the underlying policy." *Rebernick v. Wausau Gen. Ins. Co.*, 2006 WI 27, ¶ 20, 711 N.W.2d 621; see also 3 A. Widiss & J. Thomas, Uninsured & Underinsured Motorist Insurance § 32.5, at 25 (3d ed. 2005) (observing that the claim that excess or umbrella policies are not issued with respect to "particular" motor vehicles "ignore[s] the fact that the coverage provided by excess (including umbrella) insurance is generally conditioned on the existence of one or more primary coverages"). The argument is therefore unpersuasive.

¶ 11. ICSOP also cites several references to "automobile insurance policies" or "automobile liability insurance" in materials culled from the statute's legislative history. None of these references, however, evinces a discrete legislative intent to exclude excess or umbrella policies that insure against motor vehicle liability, much less even a legislative awareness of the issue. We thus draw no insights from these isolated statements concerning the question before us.

¶ 12. ICSOP additionally refers us to several bills that have been proposed in the Vermont General Assembly since this case arose, seeking to revise § 941 to expressly require UM/UIM coverage in excess or umbrella policies. Nothing in the bills cited by ICSOP, however, indicates whether they are intended to amend or clarify existing law, even assuming that such after-the-fact pronouncements might be useful in determining the intentions of an earlier legislature. See *Town of Killington v. State*, 172 Vt. 182, 194, 776 A.2d 395, 404 (2001) (recognizing that the views of a later legislature form a "hazardous basis" for inferring the intent of an earlier one); *People v. Cruz*, 919 P.2d 731, 742 (Cal. 1996) (determining whether subsequent legislation constitutes a "modification or instead a clarification" of existing law is ultimately a judicial function, as the legislative branch has no authority to interpret a statute or dictate what it meant in an earlier statute); *Coca Cola Bottling Co. v. Comm'r of Revenue*, 473 N.E.2d 187, 189 n.3 (Mass. 1985) (observing that "[w]hat the . . . legislation involved in this case means cannot rationally be influenced by [subsequent] legislation").

¶ 13. Finally in this regard, ICSOP cites the "inherent differences" between automobile and multi-risk umbrella policies, noting that the latter typically provide greater coverage against lesser risks of catastrophic liability, with accordingly lower pre-

miums. ICSOP argues that subjecting excess policies to mandatory UM/UIM requirements would therefore defeat insurers' legitimate expectations and ultimately result in higher premiums and fewer policies. The insurer in *Monteith*, however, might just as easily have made the same argument, claiming that its "expectations" would be defeated by applying the UM/UIM statute despite an explicit policy provision excluding coverage for injuries sustained in a motor vehicle not owned by the insured. 159 Vt. at 384-85, 618 A.2d at 492. We held, however, that the dispositive consideration was not the insurer's expectations but the fact that its policies "violate[d] the plain language of the statute and undercut[] the policy and purpose of UM/UIM statutes." *Id.* That purpose, we explained, was to extend to "the insured injured person the same recovery which would have been available to him had the tortfeasor been insured to the same extent as the injured party." *Id.* (quotation omitted).

■ ¶ 14. That same purpose is equally served when an insured who is injured by an underinsured motorist receives the full benefit of the "excess" coverage for which the insured — through prudence and foresight — has contracted. As in *Monteith*, applying the plain language of the statute in these circumstances is "consistent with the basic philosophy of the statute, which is to put the insured in the *same* position as if the negligent driver had been as responsible as the insured in obtaining liability insurance." *Id.* at 381, 618 A.2d at 490 (emphasis added). Whether, or to what extent, application of § 941 to excess liability policies may affect insurance premiums or availability in the future is entirely speculative, and represent questions more appropriate for the Legislature than this Court. We thus find that none of the arguments advanced provides a sound basis to depart from the plain language of the statute.

¶ 15. ICSOP's final argument rests on authority. As the record shows, and as both parties here readily acknowledge, there is a substantial split of authority nationwide on whether UM/UIM statutes apply to multi-coverage umbrella or excess liability policies. See generally L. Gregory, Annotation, *"Excess" or "Umbrella" Insurance Policy as Providing Coverage for Accidents with Uninsured or Underinsured Motorists*, 2 A.L.R.5th 922 (1992) (collecting cases and statutes and summarizing the varying judicial and legislative responses); 24 J. Appleman, Insurance Law and Practice § 147.2[B][1], at 18, 20 (2d ed. 2004) (noting the split

between jurisdictions which "do not view umbrella or excess policies as automobile policies and therefore do not require insurers to offer either UM or UIM coverage" and those holding that "if the umbrella or excess policy includes automobile liability coverage, the policy must comply with all of the provisions of the uninsured/underinsured statute"). ICSOP is certainly correct that many courts have declined to apply their states' UM/UIM statutes to excess or umbrella policies, although a significant number have concluded otherwise. More important than the numbers, however, are the reasons underlying the decisions, and these — as most courts and commentators have observed — generally turn on either the specific language of the statute at issue, the particular nature of the UM/UIM coverage required, or a combination thereof. Indeed, when these factors are accounted for, most courts have reached conclusions consistent with ours.

¶ 16. Thus, we find that courts applying UM/UIM statutes predicated — like § 941 — on the type of *coverage* rather than the type of *policy* have concluded that the statute's plain language compels the inclusion of excess or umbrella policies. In *Estate of Delmue v. Allstate Insurance Co.*, 936 P.2d 326 (Nev. 1997), for example, the Nevada statute required UM/UIM coverage in an amount equal to the limits of liability coverage in any "policy of insurance covering the use of a passenger car." *Id.* at 327 n.3 (emphasis omitted). As the court there held, "[t]he plain language of [the statute], specifically the phrase, 'a policy of insurance covering the use of a passenger car,' does not distinguish between primary automobile coverage policies and umbrella policies," and thus was held to apply to an umbrella policy. *Id.* at 328. Similarly, in *Southern American Insurance Co. v. Dobson*, 441 So. 2d 1185 (La. 1983), the court noted that the Louisiana statute did not specify the types of policies required to provide UM/UIM coverage, but rather applied to "automobile liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle." *Id.* at 1186-87 (quotation omitted). The court thus concluded that the "plain language" of the statute made it applicable to an umbrella policy covering liability "arising out of the ownership, maintenance, or use of a motor vehicle" regardless of whether "such coverage is made to depend on a primary policy or that the policy contains other provisions which cover other types of losses." *Id.* at 1190 (quotation omitted). The court reached the same conclusion in *Chicago Insurance Co. v. Dominguez*, 420

So. 2d 882 (Fla. Dist. Ct. App. 1982), where the statute required UM/UIM coverage for liability arising out of the ownership, maintenance, or use of any motor vehicle but made no reference to any particular type of policy. Holding that the statute covered the umbrella policies at issue, the court observed that "these policies do provide coverage which includes liability for motor vehicle accidents, and the statute delineates no exceptions." *Id.* at 883.

¶ 17. In contrast, some courts have held that UM/UIM statutes that refer specifically to "automobile liability policies" or "motor vehicle policies" exclude, by definition, multi-risk umbrella policies. See, e.g., *Rowe v. Travelers Indem. Co.*, 800 P.2d 157, 159-61 (Mont. 1990) (holding that by its plain terms statute did not include commercial umbrella policy where statute provided that "[n]o automobile liability or motor vehicle liability policy" may issue without UM/UIM coverage and specifically defined motor vehicle policy as "an owner's or operator's policy of liability insurance"). Such language, of course, is notably absent from 23 V.S.A. § 941. Yet even in those states where it is present a number have held that their UM/UIM statute applies to excess or umbrella policies absent an express exclusion or limitation to "primary" policies. In *Abrohams v. Atlantic Mutual Insurance Agency*, 638 S.E.2d 330, 332 (Ga. Ct. App. 2006), for example, the statute provided that no "automobile liability policy or motor vehicle liability policy" may issue unless it contains provisions for UM coverage equal to the policy's liability coverage. *Id.* at 331. Rejecting the insurer's claim that the statute, by its terms, excluded the insured's multi-risk umbrella policy, the court observed that "the language of the statute does not limit its application to primary policies," *id.* at 332, and concluded that "nothing in the statute suggest[s] that an umbrella or excess policy that provides automobile or motor vehicle liability insurance should be exempt from the requirements of the statute merely because it is not a primary policy or covers additional types of liability." *Id.* at 333. Other courts have reached similar conclusions. See, e.g., *Ormsbee v. Allstate Ins. Co.*, 859 P.2d 732, 734 (Ariz. 1993) (holding that UM/UIM statute included umbrella policies where, despite reference to "automobile liability or motor vehicle liability policy," it made "no mention of primary coverage"); *United Nat'l Ins. Co. v. DePrizio*, 705 N.E.2d 455, 459 (Ind. 1999) (although UM statute referred to "automobile or motor vehicle

liability policy" of insurance, court found "nothing in the statute suggesting that a policy which provides [automobile liability] coverage should escape the reach of the statute merely because it depends on a primary policy or covers additional types of liability"); *Duriak v. Globe Am. Cas. Co.*, 502 N.E.2d 620, 622-23 (Ohio 1986) (although UM/UIM statute referenced "automobile liability or motor vehicle liability policy," court held that it applied to umbrella policy absent an express "exception . . . with respect to excess insurance coverage").

¶ 18. A number of courts, to be sure, have construed similar statutory language to reach a different conclusion. These cases have generally turned on the additional factor of whether the statute requires "minimum" or "full recovery" UM/UIM coverage. Thus, regardless of the specific statutory phrasing, states requiring insurers to write UM/UIM coverage only to the statutory "minimum" of liability coverage have generally held that such statutes do not apply to umbrella or excess policies because the legislative purpose is satisfied by application of the primary policy. See, e.g., *Hartbarger v. Country Mut. Ins. Co.*, 437 N.E.2d 691, 694 (Ill. App. Ct. 1982) (where UM/UIM statute was enacted "to insure a minimum amount of uninsured motorist protection" the insured "receives the full protection contemplated by the statute when he purchases the underlying automobile policy, and whatever additional coverage he does or does not obtain in an umbrella policy is a matter without the scope of that law"); see generally Gregory, *supra*, at 934 ("Most jurisdictions which ascribe to the view that umbrella policies do not provide uninsured motorist coverage have 'minimum liability' statutes . . . thus insuring only that an injured motorist recover the same amount as would be available from an uninsured motorist if the motorist had maintained the minimum statutory limit of bodily injury liability coverage.").

¶ 19. Those states, in contrast, requiring UM/UIM coverage *equal* to the limits of liability coverage — as provided by 23 V.S.A. § 941 — have generally concluded that the legislative policy of affording full recovery is furthered by the inclusion of excess or umbrella policies. See generally *Rowe*, 800 P.2d at 159 ("Most jurisdictions which have 'full recovery' uninsured motorist statutes have concluded that since an umbrella policy includes liability coverage for motor vehicle accidents, an umbrella policy must offer an equivalent amount of uninsured motorist benefits to the

insured in order to permit full recovery."); Gregory, *supra*, at 934 ("In . . . jurisdictions which have 'full recovery' uninsured motorist statutes requiring that automobile insurers offer or provide uninsured motorist coverage equal to overall policy limits, courts have adopted the view that umbrella policies must comply with the terms of [the] statute."). In *DePrizio*, for example, although the Indiana statute required UM/UIM coverage "in each automobile liability or motor vehicle liability policy" insuring against loss arising from the use of a motor vehicle, the court concluded that "nothing in the statute" suggested that the legislature intended to exclude umbrella policies. 705 N.E.2d at 458-59. Central to this conclusion, the court reasoned, was the fact that Indiana required UM/UIM coverage equal to liability coverage, thus "manifest[ing] an intent by [the] legislature to give insureds the opportunity for full compensation for injuries inflicted by financially irresponsible motorists." *Id.* at 461. Accordingly, "[t]o hold that an umbrella policy which by its terms covers risks above those insured in an underlying automobile policy does not apply to the underlying uninsured or underinsured motorist coverage would contravene that intent." *Id.*

¶ 20. The great majority of jurisdictions with full recovery statutes similar to our own have reached the same conclusion. See *Ormsbee*, 859 P.2d at 735 (holding that "[b]ecause the [Arizona] statute links the amount of uninsured/underinsured coverage to the amount of liability coverage, it makes sense that, as the latter increases, as through umbrella polices, the former must also increase"); *Dominguez*, 420 So. 2d at 883 (relying on the legislative policy of affording the insured coverage "equal to the limits of his motor vehicle liability coverage" in holding that "even an umbrella insurer must afford uninsured motorist coverage equivalent to the liability limits in the absence of an informed rejection"); *Abrohams*, 638 S.E.2d at 333 ("To hold that umbrella and excess policies are exempt from the UM statute would contravene [full recovery] intent."); *Bartee v. R.T.C. Transp., Inc.*, 781 P.2d 1084, 1091-94 (Kan. 1989) (relying on full recovery policy of statute to hold that umbrella policy must include UM/UIM coverage); *Dobson*, 441 So. 2d at 1191 (applying UM/UIM statute to umbrella policies is consistent with legislative policy "to provide full recovery under the terms of any applicable policies to a person injured, through no fault of his own, by an uninsured or underinsured motorist"); *Estate of Delmue*, 936 P.2d at 329

(applying full recovery UM/UIM statute to umbrella policies is "in harmony with the legislature's intent"); *Isenhour v. Universal Underwriters Ins. Co.*, 461 S.E.2d 317, 322 (N.C. 1995) ("Because the statute links the amount of UIM coverage to the amount of liability coverage, the increase of liability coverage through umbrella coverage provisions will naturally cause an insurer to offer UIM coverage in a higher amount."); see also *Duriak*, 502 N.E.2d at 622 (applying UM statute to umbrella policy while not specifically citing requirement of UM coverage "equivalent" to liability coverage); *Am. Econ. Ins. Co. v. Canamore*, 834 P.2d 542, 544 (Or. Ct. App. 1992) (holding that UM statute applies to umbrella policy without drawing express link to full recovery policy of statute). Although a minority of full-recovery states have reached the opposition conclusion, they have generally relied on evidence of a legislative intent to limit the scope of mandatory UM/UIM coverage to primary motor vehicle liability policies, evidence not present here. See *Cohn v. Pac. Employers Ins. Co.*, 569 A.2d 544, 547-48 (Conn. 1990) (concluding that "automobile liability policy as referred to in" the UM/UIM statute necessarily refers to primary underlying motor vehicle policy); *United Servs. Auto. Ass'n v. Wilkinson*, 569 A.2d 749, 753 (N.H. 1989) (noting that umbrella policies "do not fit the legislative definition of a motor vehicle liability policy"); see also *Kromer v. Reliance Ins. Co.*, 677 A.2d 1224 (Pa. Super. Ct. 1996) (finding no legislative intent to apply UM/UIM statute to excess policies).

¶ 21. Finally, we note that a few states have found umbrella policies to be exempt from their UM/UIM statutes, regardless of whether they require minimal or full coverage, based on perceived differences between primary and umbrella policies. See, e.g., *MacKenzie v. Empire Ins. Cos.*, 782 P.2d 1063, 1066 n.5 (Wash. 1989) ("As we perceive it, the primary reason that the UIM statutes do not apply to umbrella policies is that such policies are an *inherently different type of policy*, not because a UIM statute may only require a minimum amount of UIM coverage."). As discussed earlier, however, such purported distinctions, based upon the fact that umbrella policies cover persons rather than vehicles and multiple rather than single risks, have little or no bearing on the question of whether, under the statute, they provide coverage "against liability arising out of the ownership, maintenance or use of any motor vehicle." 23 V.S.A. § 941(a). The task before us is to construe the statutory language enacted by the Legislature, not the labels attached by the insurer.

¶ 22. Thus, while far from uniform, the case law generally supports a result consistent with the language and the legislative purpose underlying our own UM/UIM statute. As one court has cogently observed, to accept the ICSOP position here would "require[] this Court to look beyond the plain language of the statute . . . and ultimately find that the Legislature intended to exclude umbrella policies" despite the fact that it "clearly outlined the type of coverage that triggers the statute's application." *DePrizio*, 705 N.E.2d at 459. Like the court in *DePrizio*, we see nothing in § 941 suggesting that an excess or umbrella policy which — in the precise language of the statute — provides coverage against liability "resulting from the ownership, maintenance or use of a motor vehicle" should "escape the reach of the statute merely because it depends on a primary policy or covers additional types of liability." *DePrizio*, 705 N.E.2d at 459. This conclusion is also consistent with the "full recovery" nature of our statute, which provides that the limits of UM/UIM coverage "shall be the same" as those of the insured's basic liability coverage, 23 V.S.A. § 941(c), and with the decisions of most courts construing similar statutes.

¶ 23. Finally, ICSOP observes that some court decisions applying UM/UIM statutes to excess or umbrella policies have been subsequently reversed or modified by legislative action. We reject the assertion, however, that such action is necessarily indicative of interpretive error. As earlier noted, a statute stands on its own terms; whatever action a legislature may subsequently take offers limited insight into an earlier intention. See *Coca Cola Bottling Co.*, 473 N.E.2d at 189 n.3 ("What the . . . legislation involved in this case means cannot rationally be influenced by [subsequent] legislation."); *Castillo v. State*, 874 P.2d 1252, 1257 (Nev. 1994) (observing that generally "courts have held that legislative enactments responding to judicial interpretations of a statute . . . are not 'clarifications' of original legislative intent, but are *amendments* presumed to operate prospectively absent contrary legislative intent."). Our holding here is compelled by the plain and unambiguous language of the statute, and consistent with the policy of "put[ting] the insured in the same position as if the negligent driver had been as responsible as the insured in obtaining liability insurance." *Monteith*, 159 Vt. at 381, 618 A.2d at 490. The Legislature obviously remains free to modify the statute should it decide to adopt a different policy.

■ ¶ 24. For all of the foregoing reasons, therefore, we answer the question certified to us by the United States District Court for the District of Vermont in the affirmative, holding that 23 V.S.A. § 941, by its terms, does apply to excess or umbrella policies that provide coverage against liability arising out of the ownership, maintenance, or use of a motor vehicle.

*The certified question is answered in the affirmative.*

¶ 25. **Skoglund, J.,** dissenting. While I agree that the language of 23 V.S.A. § 941(a) is susceptible to the majority's interpretation, because all other indications compel a contrary construction, I respectfully dissent.

¶ 26. As the majority recites, our "paramount goal" when construing a statute is to implement the will of the Legislature. *Colwell v. Allstate Ins. Co.,* 2003 VT 5, ¶ 7, 175 Vt. 61, 819 A.2d 727. "When the language of a statute is plain and unambiguous, we presume that the Legislature intended the meaning expressed by that language." *Id.* Indeed, in such situations, we view it as our duty "to enforce the statute according to its terms without resort to statutory construction." *Id.* However, when "both parties' interpretations are plausible . . . we must ascertain legislative intent through consideration of the entire statute, including its subject matter, effects and consequences, as well as the reason and spirit of the law." *In re Estate of Cote,* 2004 VT 17, ¶ 10, 176 Vt. 293, 848 A.2d 264. And even where a statute is unambiguous, "when the objective of the legislation would be defeated by literal enforcement of statutory provisions," we may "depart from the ordinary and usual meaning of the language used therein." *State v. Stell,* 2007 VT 106, ¶ 12, 182 Vt. 368, 937 A.2d 649 (quotation omitted). An inquiry broader than reference to the statutory language alone is appropriate in this case. Such an inquiry compels the conclusion that the Legislature did not intend for 23 V.S.A. § 941(a) to apply to excess or umbrella insurance policies. Thus, I would interpret the statute to exclude such policies from its purview.

¶ 27. Section 941(a) provides, in relevant part, that "[n]o policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle may be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless [UM/UIM] coverage is provided therein, or supplemental thereto." 23 V.S.A. § 941(a). The

question presented by this appeal is whether excess and umbrella liability policies can be "polic[ies] insuring against liability arising out of the ownership, maintenance or use of [a] motor vehicle" within the meaning of the statute. *Id.* The majority takes the language to mean "no policy [which includes a provision] insuring against liability arising out of the ownership, maintenance or use of any motor vehicle," whereas ICSOP contends that the language "[n]o policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle" simply means "no automobile insurance policy." In other words, ICSOP reads the statute to govern "automobile insurance policies."[4]

¶ 28. The majority fails to acknowledge that appellant has made this plain-language argument, let alone explain why it is not plausible. Moreover, the ambiguity of the language becomes more apparent when one considers how the statute might read were it to unequivocally conform to either the majority's or appellant's interpretations. The language could, of course, have expanded the scope of the statute by expressly providing that it applied to excess and umbrella policies, in which case the federal court would not have needed to certify the question it did. On the other hand, the Legislature could have unambiguously limited the statute's application by expressly circumscribing its purview to "primary automobile insurance policies," in which case appellant would plainly prevail. The fact remains that, as phrased, the statute could plausibly be read either way.

¶ 29. My main point of departure with the majority, however, is not its failure to grapple with appellant's plain-language argument, but its failure to recognize that the statutory context of § 941, as well as its legislative history, purpose, and the nature of its

---

[4] Indeed, the Legislature has referred to automobile insurance policies with variously phrased provisions of differing lengths throughout the code. See 8 V.S.A. § 4203(5), (6) ("[p]olicies of motor vehicle insurance"); *id.* § 4210 ("motor vehicle liability insurance policy"); *id.* § 4222(1) ("automobile liability policy"); *id.* § 4223 ("automobile insurance"); *id.* § 4227 ("automobile bodily injury and property damage liability coverage"); *id.* § 4241 ("automobile insurance against bodily injury, property damage, medical payments, or other loss, including what are commonly known as 'liability,' 'collision,' 'comprehensive' or 'uninsured motorist' coverages"); 23 V.S.A. § 800(a) ("automobile liability policy"); *id.* § 941 ("policy insuring against liability arising out of the ownership, maintenance or use of any motor vehicle"); *id.* § 942 ("automobile liability insurance"); *id.* § 943 ("motor vehicle liability insurance").

subject matter, compels a construction that precludes its application to excess and umbrella policies.

¶ 30. It is a matter of common sense, of course, that in the interpretation of statutes, context is important. Cf. *In re S-S Corp.*, 2006 VT 8, ¶ 9, 179 Vt. 302, 896 A.2d 67 ("It is unsurprising that the meaning of a term undefined by statute . . . will vary depending on the context in which the term is used."). Of this truism has been born the canons of statutory construction, oft-cited by this Court, that we "read operative sections of the statutory scheme in context" and that we read "the entire scheme in pari materia." *Cushion v. Department of PATH*, 174 Vt. 475, 479, 807 A.2d 425, 430 (2002) (mem.); see also *Galkin v. Town of Chester*, 168 Vt. 82, 87, 716 A.2d 25, 29 (1998) (same); *Wolfe v. Yudichak*, 153 Vt. 235, 240, 571 A.2d 592, 595 (1989) (same).[5]

¶ 31. Our first clue that 23 V.S.A. § 941 was intended to apply to automobile insurance policies is its placement in the code. Title 23 specifically governs motor vehicles. As chapter 11 of Title 23 is entitled "Financial Responsibility and Insurance," the provisions therein naturally apply to the financial responsibility of motorists and to motor vehicle insurance. Indeed, § 800(a)'s requirement that drivers maintain "an automobile liability policy" providing a minimum of coverage relates to both topics. And so do the provisions in subchapter 5, entitled "Insurance Against Uninsured, Underinsured or Unknown Motorists," in which § 941 has been codified. See *Humphrey v. Vt. Mut. Auto. Ins. Co.*, 2009 VT 53, ¶ 8, 186 Vt. 537, 979 A.2d 452 (mem.) ("The overriding purpose of [the] UM/UIM requirement is to protect the insured from the misfortune of being involved in an accident with a financially irresponsible driver." (quotation omitted)).

¶ 32. The case for a narrow interpretation of § 941 becomes stronger upon inspection of the two other statutes in the

---

[5] Our current formulation of the latter canon is unfortunate, and I take this opportunity to correct it. "In pari materia" means "[o]n the same subject," or "relating to the same matter." Black's Law Dictionary 862 (9th ed. 2009). As a result, the canon should read "statutes that are in pari materia may be construed together." *Id.* (emphasis omitted); see also *Town of Highgate v. State*, 59 Vt. 39, 45, 7 A. 898, 898 (1886) ("It is a well settled rule that all statutes *in pari materia*, are to be read and construed together as if they formed parts of the same statute, and were enacted at the same time."). The latter canon is but an extension of the former; it broadens the relevant "context" to statutes regarding the same subject wherever codified and whenever enacted. See Black's Law Dictionary, *supra*, at 862.

subchapter. As is typical of provisions governing automobile liability insurance generally, see *supra*, ¶ 27 n.4, the statutes in subchapter 5 do not identify their subjects with uniform language. As discussed, § 941 applies to "polic[ies] insuring against liability arising out of the ownership, maintenance or use of any motor vehicle." In contrast, § 942 refers to "automobile liability insurance . . . polic[ies]," and § 943 refers to "policies of motor vehicle liability insurance." The majority takes this as evidence that the Legislature intended the applicability of § 941 to be broader than §§ 942 and 943, which, in its opinion, plainly only relate to automobile insurance policies. See *ante*, ¶¶ 8-9. However, because we construe statutes in pari materia together, I do not give this variance in language any significant weight. See *supra*, ¶ 27 n.4. According significance to variations in legislative language is only appropriate when those variations are useful in clarifying meaning — for instance, when there is some uniformity against which to compare a linguistic aberration. See *Galkin*, 168 Vt. at 88, 716 A.2d at 29 (concluding that omission of particular language in statute "lack[ed] legal significance" where the Legislature failed to use uniform language throughout). In light of the many different phrases the Legislature has used to refer to automobile insurance policies throughout the code, it is not at all likely that it intended "polic[ies] insuring against liability arising out of the ownership, maintenance or use of any motor vehicle," § 941, "automobile liability insurance . . . polic[ies]," § 942, and "policies of motor vehicle liability insurance," § 943, to mean two or three different things. See *Davis v. Hunt*, 167 Vt. 263, 267, 704 A.2d 1166, 1169 (1997) (reading general language as limited by specific language in the immediately preceding subsection).

¶ 33. My reading is also supported by what we can tell about the Legislature's likely purpose in enacting § 941 from the statute's legislative history. For instance, in March 1968, prior to the original enactment of the statute, the Commissioner of Banking and Insurance sent a memo to the Senate Banking and Corporations Committee regarding House Bill H.487, describing the bill as a means to "improve the *automobile liability insurance* climate in Vermont" by filling a "gap[]" in such coverage. Letter from Comm'r J. Hunt to Senate Banking and Corps. Comm. (Mar. 18, 1968) (emphasis added). The Commissioner further explained that "[t]his bill would make [UM coverage] a required provision of every policy *of automobile liability insurance* in Vermont." *Id.*

(emphasis added). Such communications constitute some evidence that excess and umbrella coverage was not being considered as within the scope of the original act.

¶ 34. The legislative history of § 941's amendments is similarly instructive. In 1979, House Bill H.411 was introduced to make changes to the Vermont financial responsibility laws by adding language regarding underinsured motorists as well as increasing minimum coverage limits for all motor vehicle policies. The stated purpose of H.411 was "to require *automobile insurance policies* to provide protection against certain underinsured motorists." H.411, 1979-1980 Gen. Assem., Bien. Sess. (Vt. 1979) (emphasis added). And more recently, in the report to the General Assembly by the Department of Banking, Insurance, Securities and Health Care Administration regarding UM/UIM coverage, the introduction and executive summary described § 941 as applicable to "all *automobile liability insurance policies* issued for delivery in Vermont." Dep't of Banking, Ins., Secs. & Health Care Admin., Report to the General Assembly Pursuant to H. 453, § 2, at 1 (Jan. 15, 2004) (emphasis added). Consistent with a narrow interpretation of § 941, the report repeatedly refers to "automobile insurance liability policies" or "automobile liability insurance" without reference to other liability coverage such as umbrella or excess policies. *Id.* at 1-11.

¶ 35. While I admit that these pieces of legislative history are not conclusive proof of an intent to *exclude* excess and umbrella policies from the purview of § 941, they are persuasive evidence that lawmakers and their contemporaries did not have excess and umbrella policies in mind when drafting, amending, and discussing the statute. If this were not enough to persuade me that the scope of § 941 should be limited to automobile insurance policies, more recent activity at the State House would be. Recently proposed in the House was a bill amending § 941 to explicitly provide that "an insurer must offer [UM/UIM] coverage . . . in excess or umbrella insurance policies." H.787, 2007-2008 Gen. Assem., Bien. Sess. (Vt. 2008). A related Senate bill was contemporaneously proposed by Senator Campbell, appellee's counsel. See S.349, 2007-2008 Gen. Assem., Bien. Sess. (Vt. 2008) (proposing requiring uninsured motorist coverage for state employees to be not less than $5 million per occurrence and $10 million aggregate). So while previous generations of legislators apparently did not contemplate the possibility that excess and umbrella

policies may be implicated by § 941, today's lawmakers most certainly do.

¶ 36. The majority dismisses the recently proposed bills by reasoning that "[n]othing in the bills . . . indicates whether they are intended to amend or clarify existing law." *Ante*, ¶ 12. However, as we have often stated, "[w]hile we recognize that clarification is a legitimate objective of legislative action, we presume that the Legislature intends to change the meaning of a statute, unless the circumstances clearly indicate clarification to be intended." *Tarrant v. Dep't of Taxes*, 169 Vt. 189, 198, 733 A.2d 733, 740 (1999) (quotation omitted). I see no circumstances indicating that the proposed bills were intended to clarify existing law, and thus nothing to rebut the presumption that the amendments are intended to alter it. See *id.* (reaching the same conclusion). This Court's role is "to interpret statutes so as to give them effect," not to involve itself in ongoing political and legislative initiatives. *In re C.S.*, 158 Vt. 339, 344, 609 A.2d 641, 644 (1992). Apparently, in the Legislature's judgment, § 941 does not as yet apply to excess and umbrella policies. We should not cut off legislative debate as to whether that should continue to be the case by reading the proposed amendments into the current version of § 941.

¶ 37. Perhaps the most persuasive evidence that the Legislature did not mean to extend the reach of § 941 to umbrella and excess policies, however, is the inherent dissimilarity between first party automobile insurance policies and third party excess and umbrella policies. See *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 39, 177 Vt. 215, 862 A.2d 251 (recognizing that "excess policies are generally purchased to provide the insured protection in the event of a catastrophic loss that exceeds the limits of the insured's primary policy."). Umbrella and excess policies provide broad coverage for catastrophic losses at modest cost, whereas primary automobile insurance policies are designed to protect exclusively against loss or legal liability for damages "arising out of the ownership, maintenance or operation of an automobile." *Mass v. U.S. Fid. & Guar. Co.*, 610 A.2d 1185, 1190 (Conn. 1992). For this reason, the extension of UM/UIM requirements to excess and umbrella policies has been criticized, among others, by a leading commentator on insurance law, who states:

> Umbrella policies serve an important function in the industry. In this day of uncommon, but possible, enor-

mous verdicts, they pick up this exceptional hazard at a small premium. Assuming one's automobile and home-owner's policies have liability limits of $100,000 or even $500,000, the umbrella policy may pick up at that point and cover for an additional million, five million, or ten million. It may assume as a primary carrier certain coverages not included elsewhere, such as invasion of privacy, false arrest etc., but there is no intention to supplant the basic carriers on the homeowners or auto-mobile coverages. Therefore, these should not even enter into our current consideration.

However, because of the misunderstanding of the courts as to the nature of such coverages, they have been held to fall within the definition of automobile liability insurance.

8C J. & J. Appleman, Insurance Law and Practice § 5071.65, at 107-08 (1981); *id.* Interim Supp. § 5071.65, at 17-18 (2003).

¶ 38. Appellant points out that subjecting excess policies to mandatory UM/UIM requirements defeats insurers' legitimate expectations. While, as the majority correctly notes, insurers' expectations are not dispositive of the meaning of a statute, *Monteith v. Jefferson Ins. Co. of N.Y.*, 159 Vt. 378, 384-85, 618 A.2d 488, 489 (1992), the Legislature's expectations are. Due to the inherent differences between the two kinds of policies at issue in this case, I think it unwise to assume that the Legislature meant for § 941 to apply to excess and umbrella policies without a clear statement to that effect.

¶ 39. There is voluminous authority recognizing that excess and umbrella policies are inherently different from automobile insur-ance policies and the principle that this difference supports limiting the applicability of UM/UIM requirements to the latter type of policy. See, e.g., *Reddy v. N.H. Ins. Co.*, 612 A.2d 64, 68-69 (Conn. App. Ct. 1992) (noting that "the distinction between primary and excess insurance policies is the key to determining whether a policy is an automobile liability insurance policy and thus is required to provide uninsured motorist coverage pursuant to [statute]"); *Mass*, 610 A.2d at 1190 (excess policies serve purpose distinct from policies that exclusively cover liability aris-ing out of ownership, maintenance or operation of a motor vehicle); *Liberty Mut. Ins. Co. v. McLaughlin*, 590 N.E.2d 679,

680 (Mass. 1992); *Sidelnik v. Am. States Ins. Co.*, 914 S.W.2d 689, 694 (Tex. App. 1996) ("We are persuaded that umbrella policies providing excess liability coverage serve a purpose distinct from that served by policies that exclusively cover liability from damages arising from the ownership, maintenance, or use of an automobile."); *MacKenzie v. Empire Ins. Cos.*, 782 P.2d 1063, 1066 n.5 (Wash. 1989) ("As we perceive it, the primary reason that the UIM statutes do not apply to umbrella policies is that such policies are an *inherently different type of policy.*"). I presume that the Legislature enacted and amended § 941 well-informed of the differences between these two kinds of insurance coverages. I therefore cannot countenance adopting a construction of § 941 that ignores this distinction.

¶ 40. Finally, I will briefly address several points of disagreement with how the majority applies authority from other jurisdictions. The majority bootstraps support for its election to join up with one side of an admittedly considerable split in authority in part by means of its conclusion that § 941 is "predicated . . . on the type of *coverage* rather than the type of *policy." Ante*, ¶ 16. I have explained why, in my judgment, this variation in language is insignificant in determining the meaning of this statute. *Supra*, ¶ 32. Moreover, I agree with those courts which have reasoned that whether a statute requires "minimum" or "full recovery" UM/UIM coverage — the second tool by which the majority parses the caselaw, *ante*, ¶¶ 18-20 — is irrelevant to the question of whether excess and umbrella policies come within the statute's purview. See, e.g., *Schmitt v. Am. Family Mut. Ins. Co.*, 161 F.3d 1115, 1116 (7th Cir. 1998).

¶ 41. For all the above-stated reasons, I respectfully dissent. I am authorized to state that Justice Burgess joins in this dissent.